TEXAS EMPLOYERS' INSURANCE
ASSOCIATION, Appellant,

v.

C. H. HARTEL, Appellee.

No. 6606.

Court of Civil Appeals of Texas.

Amarillo.

March 19, 1956.

Rehearing Denied April 16, 1956.

Crenshaw, Dupree & Milam, Lubbock (Max Addison of counsel), Lubbock, for appellant.

Huff & Splawn, Lubbock, for appellee.

NORTHCUTT, Justice.

This is a workmen's compensation case. The parties will be referred to as they were in the trial court. Plaintiff, in seeking to recover for the loss of the use of his left hand and arm, alleged that:

"* * * on or about October 30, 1953, and prior thereto, plaintiff herein was in the employ of Head Drilling Company, Inc., in Garza County, Texas; and that he was engaged in the course of his usual and regular employment for said employer; that while engaged in his employment as an employee, laborer and/or oil field worker for said above mentioned employer, Head Drilling Company, Incorporated, plaintiff was suddenly, accidentally and unexpectedly injured in that while working on an oil derrick and while going in hole derrick man snagged two joints of casing or drill pipes with elevator and when the stand was brought over it fell about four feet catching left hand left arm between the tongs and stand and as a result of said accident, plaintiff sustained and suffered the following injuries: severe damage to the left hand, left arm and left shoulder; which caused traumatic

amputation of the distal end of the 4th finger near the middle of the 2nd phalanx; fractures of the 1st phalanx of the 5th finger; marked ankylosis and adhesions of the 3rd finger; traumatic neuritis involving the nerves which supply the 4th finger of the left hand which is a component part of the median nerve which extends upward toward the elbow on the anterior surface of the arm; severe and excruciating pain which extends from the left hand, left wrist and elbow on up into the left shoulder with severe nerve involvement of the nerve through which supplies the nerves in the hand and running up into the elbow and left shoulders, together with rupture and contusion of all the muscles, nerves, tendons, legaments, soft tissues and blood vessels in the left hand, left arm and left shoulder which has caused total loss of use of the left hand and left arm."

The defendant answered admitting an injury to the plaintiff to the extent of the amputation of a portion of the ring finger on the left hand. The case was submitted to a jury on September 22, 1954 upon thirty-nine Special Issues. On April 11, 1955, there was filed with the District Clerk, a judgment in favor of the plaintiff but said judgment was dated April 8, *1954*. On April 20, 1955, the defendant filed its motion for a new trial and, on April 27, 1955, was granted permission by the trial court to file its amended motion for a new trial which amended motion was filed May 9, 1955. This amended motion was overruled by the trial court and exceptions therein and notice of appeal given. The order overruling this amended motion for a new trial begins by stating "On this the 11 day of June, A.D.1955, came on to be heard defendant's first amended motion for new trial, * * *" and terminates by stating "This order was actually signed and entered this 11th day of May, A.D. 1955." It shows to have been filed with the Clerk on June 13, 1955. On October 4, 1955, plaintiff filed, with the District Clerk, his motion to correct the date of

the judgment and, on the same date, the trial court entered its nunc pro tunc order correcting the date that the judgment was signed to show the original judgment was actually signed on April 8, 1955 instead of April 8, *1954*. On October 4, 1955, the defendant again filed its motion for a new trial and the trial court, on the same date, entered its order overruling said motion for a new trial and showing that the defendant then and there in open court excepted and gave notice of appeal from the nunc pro tunc judgment. The defendant filed its supersedeas appeal bond in each instance after the trial court had overruled the motions for a new trial and two appeals were perfected and the two appeals were consolidated in this Court.

Appellee, plaintiff in the trial court, presented his motion here to dismiss the appeals and strike the assignments of error on the ground that the original motion for a new trial was not filed until April 20, 1955 and thereby was not filed within the ten days as provided for under Rule 329–b, Texas Rules of Civil Procedure. It is true that Rule 329–b provides that a motion for a new trial, when required, shall be filed within ten days after the judgment or other order complained of is rendered. Rule 306a provides that in determining the date of rendition of a judgment or order, it shall be deemed to be the date on which the written draft thereof was signed by the trial judge as stated therein. But Rule 306a further provides that, in the event the date of signing of a judgment or order is not shown therein as required, then the date of rendition shall be otherwise shown of record. The date it was shown to have been filed with the Clerk was April 11, 1955 and the motion for a new trial was filed within ten days from the date showing it was filed with the Clerk which would be the date otherwise shown of record. Since appellee relies upon Rule 306a as prohibiting the appellant from appealing because of the date stated in the judgment, then, he must rely upon that date, and the date given in the judgment as to the date of rendition being an impossible date because it shows the

judgment was entered several months before the case was ever tried—consequently, the date of rendition shall be otherwise shown of record and that other record would be the date of filing with the Clerk but, be that as it may, Rule 306b permits an appeal from a nunc pro tunc judgment or order and the right of appeal shall date from the date of rendition of the nunc pro tunc order.

■ There is no question in this case but what the motion for a new trial was filed within the ten days time from the date of entry of the nunc pro tunc order herein. Federal Underwriters Exchange v. Bailey, Tex.Civ.App., 175 S.W.2d 618. Appellee's motion to dismiss the appeal and strike the assignments of error is overruled.

Appellant presents this appeal upon forty-five points of error but, since reviewing this record as we do, we deem it unnecessary to discuss the points separately. However, we sustain appellant's forty-first point which is as follows:

"Point Forty One

"The trial court erred in entering judgment awarding the Appellee recovery as for loss of his hand and also as for loss of use of his arm above the elbow, because the Workmen's Compensation Act of the State of Texas does not authorize such double recovery."

Lumbermen's Reciprocal Ass'n v. Pollard, Tex.Com.App., 10 S.W.2d 982. There is no contention made in this case that any injury was caused to appellee's arm unless it was caused by the injury to the fingers in question. Dr. Cross is the only physician testifying herein and on direct examination in discussing the injuries he testified in part as follows:

"Q. Doctor, would you point out on your left hand, please, where you found this fracture, with reference to your left hand? A. That would be just beyond or near the body in this joint right here. That would be in the distal end of the first phalange, which would be right here. Now then, the fourth finger has been amputated just about the middle, or near the middle of the middle phalange of the third and the fourth fingers. Then there is a small fracture in the middle finger right near which doesn't amount to too much, just a little chipped fracture right at this point here. That is about all you can see of a bone injury. This picture over here is taken with the hand in this position to show the deformity from the side view. Now, you can still see this fracture line right through here, and the finger that has been amputated, and the fracture right here that doesn't show as clearly as it does in this picture here, and the small fracture on the middle finger is not quite so obvious from a side view as it is from a front view, as shown here.

"Q. Doctor, in your examination of Mr. Hartel in February of this year, what did you find with reference to the condition of his left hand as compared to the condition of his right hand in size? A. In February?

"Q. In February. A. That was only about four months after his injury and there was still quite a lot of soreness and some swelling in the fingers involved, and quite a bit of tenderness, but there was apparently very little atrophy of the muscles between the bones involved in the hand. I saw him again yesterday.

"Q. And you had the occasion yesterday to re-examine Mr. Hartel? A. I did.

"Q. And with reference to the atrophy that you spoke of, what was the condition yesterday as compared to what you found in February? A. A great deal more atrophy or shrinkage of the muscles—you call it withering or degeneration of the muscle tissue—and a marked weakness in the hand, which was not present at the examination I made in February. And the neuritis, the pain in the region, or the

sensitiveness, I would say, associated with the nerves of the fourth finger seemed to be more exaggerated, and there was a greater hyperthesia, more sensitiveness in the fingers and up towards the elbow than was present in February.

"Q. All right. Doctor, I would like for you to take a look at Mr. Hartel's fingers and hand. Come, up, Cooney. Be sure, Cooney, to speak out loud and clear so everyone can hear. And, Doctor, would you demonstrate to the Jury the type of examination that you gave to his left hand which would show or demonstrate the nerves involved? A. Well, the sensitiveness of the nerve we demonstrate by the use of a pin prick and by comparison with the other hand it is pretty ease to see that this hand, the muscles between the fingers, and the size of the fingers, are shrunken considerably, and there is a relaxed condition between the middle finger and the fifth finger in this area through here, and it is very sensitive. I don't need to tell you when I hurt him, you can watch his face and see that, because movement of this finger, or touching it anywhere in this area, makes him flinch, and he can't help it. I am testing the sensitiveness in the other fingers as compared with this one here. And up in here there is not so much increase in sensitivity, but that nerve follows from this finger up around into his elbow. You touch this finger here and he flinches, because that nerve that goes up there is like shooting a charge of electricity up his arm, he can't help but flinch from it. That is about the extent of the test that we give on that.

"Q. Thank you. And, Doctor, the muscles there on the back of Mr. Hartel's left hand, what did you find with reference to the muscles there on the left hand? A. Between the bones and at the base of the fingers, they have all shrunken to where there is no strength in the thing, he has no grip in his hand. He has some grip, but it is very much less than normal, don't you see. He has lost the use of that finger, he can't bend that up, it is sticking out straight, and always in his way, and for that reason he doesn't use that hand for fear of hurting that finger and therefore the muscles have shrunken from lack of use. That is the main thing that is causing that."

On cross-examination, Dr. Cross further testified:

"Q. Dr. Cross, as I understand you, sir, all you found wrong with this man when you examined him was with reference to the fingers, that is, you found no fractures or dislocations past the knuckle joint back up towards the arm? A. That isn't all I found. I found a damage to the nerve which extends from the end of the finger clear on up through the brachial plexus into the brain.

"Q. Let's first take up bony damage. That was limited, was it not, sir, according to your findings, to the ring finger, and I believe you said the middle finger and the little finger? A. That is the only bone damage that is present.

"Q. All right. Now, Doctor, did you see any indication of any injury on this man's hand back of his knuckles here, that is, did you see any bruise or any cut or any scar or anything like that? A. There is a bruise in the skin just above the ring finger there that is still present.

"Q. Did you see that on February 11th? A. Yes, it was there then and it is still there.

"Q. Did you consider it of no consequence, Doctor? A. That is a skin injury and I didn't consider that of any importance. It is one of those constantly recurring things, you will knock the skin off and it will nearly get well and you knock it off again.

"Q. It doesn't cause any disability? A. That in itself, I don't think it would.

"Q. The only thing that caused any disability, as I understand you, sir, would be the injuries that you say you found to the three fingers? A. Plus the nerve injury involved in the fourth finger.

"Q. That nerve as a matter of fact, the nerve injury would be in the ring finger, would it not? A. Yes, the end of the nerve is in the ring finger, but, as I said, that same nerve extends clear into the brain.

"Q. But it was injured on the end of the finger, or near the end of the finger? A. That's right. The bruise that cut the finger off damaged the nerve at the same time, and that has not repaired itself.

"Q. In other words, we can say, and we agree, that any injury that he had was to either his fifth, fourth or third fingers, which would include the end of the nerve in the third finger? A. That is the source of the injuries that I found, yes.

"Q. In other words, he had no injury up this way (indicating) from having his hand caught or hit? A. I didn't find any evidence of injury up above the wrist to the muscles other than an atrophy of the muscles from lack of use. I didn't find any broken bones or any indication of a damaged joint or anything like that above the wrist.

"Q. Pardon me, Doctor. Did you find any above his knuckle joints? A. Bone injury?

"Q. Yes. A. No, I didn't find anything above the knuckles, that's right.

"Q. Now, let's talk about that nerve injury just a little bit. Doctor, I believe you said now that it was injured only down here in this middle—that is the joint there—middle joint, is that correct, sir, where it was amputated? A. The joint, the bone between the joints, that would be the second phalange of the fourth finger.

"Q. And, of course, that is where this nerve was injured in this accident? A. Presumably so, yes.

"Q. Now then, Doctor, with reference to these muscles you talk about, and this wasting away,—What is it you call that? A. Atrophy.

"Q. Atrophy. Uh–huh. That is caused, as I understand you, because he hadn't used that finger? A. That is the medical reason for that kind of a thing. Because he doesn't use it, because it hurts, and the fact that he doesn't use it the muscles atrophy, because a muscle has to be used to keep its normal toneness and keep from shrinking away.

"Q. Could we say then that the reason the muscles are shrinking is because he had an injury to this finger that required amputation of that finger? A. To the three fingers there was atrophy due to the fracture in the little finger, and also in the middle finger, and the amputation and fracture of the fourth finger, ring finger. All of that together produced more or less pain for an indefinite length of time. Then the neuritis or the injury to the nerve originating in the fourth finger continued that pain and he kept on not using it and therefore he got the atrophy of the muscles.

"Q. All right, sir. That is what I wanted to get plain. The muscles weren't damaged until long after the accident, is that correct? A. I don't think the muscles were damaged. They probably were bruised some at the time, but the lack of use of the muscles is the primary cause of the atrophy. That is always the cause of muscular atrophy.

"Q. We can say then that because he didn't use his hand, and he didn't use it because of the injury you found to the fingers, that he had some atrophy of the muscles up above? A. That's right.

"Q. And that the atrophy was caused entirely by the injuries that you

found to his fingers? A. I am sure so, yes, sir.

"Q. Now, Doctor, I believe you said that the fracture to this middle finger, did you say you found one close to this joint right here? A. Yes, right in the joint.

"Q. I believe I understood you to say that really wasn't of much consequence? A. No, it is just a very small chipped fracture.

"Q. And it doesn't interfere with his finger? A. Not too much.

"Q. Did you find anything else wrong with the middle finger? A. No, I don't think there is anything, except the same nerve that supplies the fourth finger supplies the outter half of that finger, and he has some sensitiveness in that finger as a result of neuritis he has.

"Q. But as far as being able to bend his finger, it is all right? A. The movement of the finger is normal.

"Q. As far as the muscles are concerned, and the grip, they would be all right if it were not for this sensitiveness, as I understand it? A. If it were not for the atrophy of the muscles up between the knuckle joint and the wrist. That determines the strength of the fingers.

"Q. All right, sir. A. He can move that finger all right.

"Q. Okay. Now then, this finger here, the little one, can he move it all right? A. There is movement there. It is restricted to about 75 percent of normal. There is a fracture near the joint in that finger and that does give him what we call a 'hammer finger' all right. It buckles up a little bit and he can't quite straighten it out, but he can flex it like that.

"Q. He can use it some. Let's assume he had no pain here, he could use that finger some? A. I think he could if he had no pain. The same nerve that supplies the fourth finger also supplies the fifth finger, and you can't tell whether it is this finger or the fifth finger that hurts. If that nerve is sensitive and the pain is going back and he interprets it from any one of the three fingers, because half of the middle finger and all the fourth and fifth are all supplied by the same nerve that has been damaged.

"Q. We can say then that is all caused by an injury to a nerve in the fourth finger, is that correct, sir? A. Well, yes, I think that is about right.

"Q. Doctor, the middle finger, is it for all practical purposes all right except the pain you speak of? A. The middle finger?

"Q. Yes, sir. A. There is a definite atrophy of muscles between the middle finger and the fourth finger up in the carpal area, and there is a weakness up in there when he tries to grip anything. Now, all three of those fingers, the one that is amputated and the middle and the fifth, are weak because of the atrophy up in here, and there is pain in all three of them when he moves that finger. The pain originates in the fourth finger but he interprets it as being in all three fingers.

"Q. If it had not been for that amputation he could have used his hand and the muscles would not have atrophied, is that correct? A. Well, the break in the fifth finger and the middle finger I don't think would have been too important, and he would have recovered from that, and also the break in the fourth finger, if it hadn't been for the neuritis. The damaged nerve is the only thing that is wrong outside of the loss of half of the fourth finger."

On recross-examination, Dr. Cross testified:

"Q. Let me ask you this, Doctor: Let's assume that he hadn't lost this portion of his fourth finger, in your

opinion would he have had any disability to speak of in his middle finger or his little finger? A. In the little finger he would have had a buckling of the finger, he couldn't quite straighten it out. That is not considered a serious injury, very much like a baseball injury that you get. Aside from that, I don't think the middle finger would have any serious damage at all. And the whole thing, as I see it, is the damage to the nerve at the time this fourth finger was amputated, cut off. We have what we call an amputation trauma, and that is injury to a nerve end after it has been cut in two that sometimes causes pain for the rest of your life, you never do get over it. I think that is the whole thing right there."

The appellee testified that he didn't think his arm was hurt but the trouble he was having was with his finger and hand and the pain going up his arm.

■ We are aware of the fact that compensation for a specific injury is provided for in Section 12 of Art. 8306 of Vernon's Texas Civil Statutes but if the injury affects other portions of the body and causes incapacity, compensation is recoverable and may exceed the amount provided for in Section 12. It is stated in American Employers Ins. Co. v. Climer, Tex.Civ.App., 220 S.W.2d 697, at page 700:

"The testimony raises the issue of injury to, and loss of the use of, the left hand in the usual tasks of a working man. The rule is that to allow a recovery for the loss of the use of a hand, as distinguished from the fingers, the injury (that is, the damage or harm to the physical structure, and such diseases and infections as naturally result therefrom) must extend to the hand above the fingers and affect the hand proper (that is, cause a percentage of the loss of the use of the hand above the fingers) other than and in addition to that resulting from the loss of use, if any, of the fingers."

In examining the record in this case, we are unable to reach any other conclusion than there was insufficient evidence to sustain the finding by the jury that the injury sustained by appellee extended to his arm. Appellant's forty-third point of error is as follows:

"Point Forty Three

"The trial court erred in entering judgment awarding Appellee recovery of benefits as for the loss of use of his arm above the elbow, because the jury's verdict is insufficient and does not in law authorize the court to award such compensation as for the alleged loss of use of Appellee's left arm above the elbow."

There was no injury done to the arm at all except the atrophy of the muscles and that was caused, as shown by the evidence, solely from not using these muscles according to the evidence of Dr. Cross. The injury to the nerve did not cause the atrophy of the muscles but it was the lack of use. Compensation is not recoverable for pain and suffering under the workmen's compensation act. The appellee testified as follows:

"Q. You are not telling this Jury that your arm was hurt up here? A. I don't think it was hurt up here, no sir. It might have been. I don't think it was.

"Q. You are not making that claim. The trouble you are having is with your finger and your hand? A. That's right. And the pain going up my arm."

We sustain appellant's forty-third point of error. The Supreme Court, in the case of Texas Employers' Ins. Ass'n v. Brownlee, 152 Tex. 247, 256 S.W.2d 76, 77, stated as follows:

"The provisions of Article 8306, Section 12, Vernon's Annotated Civil Statutes, which govern this case, have been in effect since 1913. Of course, changes by amendment have been made by subsequent Legislatures, but from its original enactment, it was

made unmistakably clear by the Legislature that it was its intention by the enactment of Section 12 to provide that an injured employee should receive a fixed and definite compensation for certain specific injuries enumerated therein. The Section enumerates the several specific injuries and provides that the compensation for each specified injury '* * * shall be in lieu of all other compensation * * *.' Each injury enumerated is an injury to a specific member, and in order for the respondent to recover for an injury to the hand as alleged in his pleadings, he must prove that the injury to the fingers, as alleged, extended to and affected the hand. If there was impairment of the use of the hand, other than that merely resulting to it from the loss of the fingers, there would be liability supporting recovery in proportion to such impairment of the use of the hand; but, if the evidence shows that the hand was not impaired except as it was affected by the loss of the fingers, there would be, under the plain provisions of Article 8306, Section 12, supra, no recovery allowed for the loss of use of the hand. In other words, if the loss of the use of the hand resulted solely from the injury to the fingers, the respondent would be limited in his recovery to that provision of the statute which provides for compensation in the event of the loss of, or the loss of the use of, the fingers. Petroleum Casualty Co. v. Seale, Tex.Com. App., 13 S.W.2d 364; Standard Accident Ins. Co. v. Williams, Tex.Com. App., 14 S.W.2d 1015; Consolidated Underwriters v. Wilson, Tex.Civ.App., 111 S.W.2d 865, writ dismissed; American General Ins. Co. v. Beare, Tex. Civ.App., 225 S.W.2d 454, writ refused, n. r. e.; Texas Employers' Ins. Ass'n v. Moreno, Tex.Com.App., 277 S.W. 84; Lumbermen's Reciprocal Association v. Pollard, Tex.Com.App., 10 S.W. 2d 982; Federal Underwriters Exchange v. Simpson, Tex.Civ.App., 137 S.W.2d 132; Consolidated Underwrit-

ers v. Langley, 141 Tex. 78, 170 S.W.2d 463, 464."

Under this record, we hold that appellee is limited to the injuries to his fingers but do not believe the evidence is sufficient as to the damage done to the middle and little fingers for us to render judgment herein. Judgment of the trial court reversed and remanded.