AMBASSADOR OIL CORPORATION and Deane Gill, Appellants,

v.

French M. ROBERTSON, Appellee.

BLACKWELL ZINC COMPANY, Inc., et al., Appellants,

v.

French M. ROBERTSON, Appellee.

Nos. 11219, 11236.

Court of Civil Appeals of Texas.

Austin.

Nov. 4, 1964.

Rehearing Denied Nov. 25, 1964.

Hudson, Keltner, Smith & Cunningham, Fort Worth, Phipps, Smith & Alexander, McLeod, Mills, Shirley & Alexander, Galveston, Stubbeman, McRae, Sealy & Laughlin, Rush Moody, Jr., & James G. Nolan, Midland, of the firm Black & Stayton, Austin, Perkins, Bezoni & Kirwan, Midland, Paul Petty, Ballinger, McMahon, Smart, Sprain, Wilson & Camp, Abilene, for appellants.

King, Willoughby, Vletas & Dickenson, Abilene, Clark, Thomas, Harris, Denius & Winters, Austin, for appellee.

ARCHER, Chief Justice.

French M. Robertson, a surface and royalty owner sued Blackwell Zinc Company, Inc., American Metal Climax, Inc., American Climax Petroleum Corporation and Amax Petroleum Corporation, as one or a group of affiliated companies, and Union Texas Petroleum, Joseph E. Seagram & Sons, d/b/a Frankfort Oil Company, and Joseph E. Seagram & Son, Inc., the second group, as claimed operators of the Golds-

boro Unit in the East Goldsboro (Gardner) Field in Coleman and Runnels Counties, Texas. The plaintiff sought a Declaratory Judgment determining (a) the title to all of the personal property upon a tract of land, the surface of which Robertson claimed as his; (b) the use of water by "defendants" in the unit operations; and (c) plaintiff's "rights, status or other legal relations thereto." He also sued for an accounting of all salt water used for the waterflooding of the unit and for unit operations, and for money damages for the water used in such unit operations and for water furnished operators of adjoining leases within the same pool. Finally, the plaintiff asked for an injunction restraining defendants "from any further right to sell and use any of the subsurface waters in the future without the express written agreement and consent of the plaintiff.

In an amended petition plaintiff alleged that he had entered into a sales contract of oil and gas leases and properties in the Goldsboro-Gardner field and had subsequently entered into a Unitization Agreement covering said properties and providing for the waterflooding operations. He pleaded that he had also "entered into a Plant Site and Water Use Lease Agreement on ten acres of the Bright tract within the unit," which "Plant Site and Water Use Lease contract superseded, merged and/or substituted all other agreements" and which Plant Site Lease "had terminated and was of no further force and effect," and in this pleading plaintiff alleged that he "does hereby join the following additional Defendants as indispensable parties who are representatives of a class of royalty owners in the Goldsboro-Gardner Field Unit of Runnels and Coleman Counties, Texas," and thus added as parties Wallace H. Newton, Nana D. Newton, Harris D. Newton, First National Bank of Abilene, Texas, Trustee under the Will of S. M. Jay, deceased, W. J. Fulwiler, Jr. and Annie E. Bright.

Trial was had with the aid of a jury and based on the verdict, judgment rendered against Blackwell Zinc Company,

Inc., American Metal Climax, Inc., American Climax Petroleum Corporation, Amax Petroleum Corporation, Union Texas Petroleum, Joseph E. Seagram & Sons, d/b/a Frankfort Oil Company, and Joseph E. Seagram & Son, Inc., jointly and severally.

Appellant filed motion for new trial, which was overruled. The order was dated November 22, 1963. A Nunc Pro Tunc order was later entered reciting that the correct date of the order was November 25, 1963.

On February 6, 1964, Robertson filed his Motion to Affirm on Certificate under Rule 387, Texas Rules of Civil Procedure, in this Court, giving notice to attorneys for appellants.

On February 8, 1964 acting Judge John Sutton entered a Nunc Pro Tunc order, overruling the amended motion for new trial, correcting the record "to show that the order was, in fact, rendered, signed and entered on the 25th day of November, 1963."

On February 26, 1964 this Court entered an order suspending action on the pending motions "for 30 days within which appellants may, if they so desire, take steps to enter a Nunc Pro Tunc order in the premises as contemplated by Rule 316. Upon completion of such proceedings, if any, appellants may, if they desire, tender for filing herein, a supplemental transcript and if evidence is introduced, a supplemental statement of facts reflecting the record of such proceedings."

On March 12, 1964, a hearing was held and Judge Sutton reaffirmed his order overruling the amended motion for a new trial as of November 25, 1963, to which exceptions were taken and notice of appeal was given by Blackwell Zinc, appellants.

On March 18, 1964 our Supreme Court refused leave to Robertson to file a petition for mandamus seeking to require this Court to affirm on certificate.

■ In appellee's brief on the procedure of this appeal, it is said that the basic issue is:

"Does Rule 306b give a trial court the power to extend the time within which an appellant must perfect his appeal under 386, after such time has expired on the face of the record and appellee has moved the Court of Civil Appeals to affirm on certificate under Rule 387?"

We believe that this question should be answered in the affirmative.

Rule 306b provides:

"When a judgment or order is entered nunc pro tunc, the right of appeal shall date from the date of rendition of the nunc pro tunc judgment or order, which shall be deemed to be the date upon which the trial judge signed the nunc pro tunc judgment or order if the date is shown therein; and the periods within which the various steps in such an appeal are to be taken shall be computed from that date."

■ Under Rules 363 and 306b, Blackwell Zinc, appellants, have perfected a new and different appeal from that involved in appellee's Motion to Affirm on Certificate, and their right of appeal dates from the rendition of the Nunc Pro Tunc order, which in this case was March 12, 1964. Texas Employers' Insurance Association v. Hartel, Tex.Civ.App., 289 S.W.2d 380, er. dism.; Hernandez v. Baucum, Tex.Civ. App., 338 S.W.2d 481, no writ history; Knox v. Long, 152 Tex. 291, 257 S.W.2d 289; 4 McDonald, Texas Civil Practice, Section 17.07, p. 1323.

We will now consider the case on the merits and will endeavor not to repeat what has been said hereinabove.

Blackwell Zinc's appeal is based on 29 points assigned as error, the first 5 are to the effect that the trial court erred in overruling pleas in abatement and motions to dismiss, lack of jurisdiction because of

any effective joinder or indispensable parties, and that the surface and royalty owners who had signed the Unitization Agreement were not represented in person or by attorney in the trial, and there was no effective joinder of indispensable parties so as to insure the adequate representation of all of the class.

In the pleading on which trial was had plaintiff stated that:

"For cause of action herein Plaintiff would show to the Court that the Plaintiff and 'Defendants' entered into a sales contract of oil and gas lease properties concerning the Goldsboro-Gardner Field in Coleman and Runnels Counties, Texas, and subsequently entered into a Unitization Agreement covering said properties, and subsequently plaintiff and 'Defendants' entered into a Plant Site and Water Use Lease Agreement (attached hereto and made a part hereof for all purposes and references) on a certain 10 acres of land on the Bright Fee Land described above and owned by the Plaintiff; that the Unitization Agreement described the acreage involved in the unit operations, and the Plant Site and Water Lease contract superseded, merged and/or substituted all other agreements heretofore existing and expressly granted to the 'Defendants' the right to drill a water well and that said water well was drilled to serve all said unit operations and which 'Defendants' were granted the right to use water * * * Furthermore, the Plant Site and Water Use Lease superseded, merged and/or substituted all other previous agreements and the 'Defendants' ought to be estopped to claim any other rights by any prior agreements."

Plaintiff sought title and possession of all the personal property on the .10 acre plant site, for injunction, etc.

The Unitization Agreement provides in Article 3, Section 3.5 Injection Rights:

"Royalty Owners hereby grant unto Lessee the right to inject into the Unitized Formation any substances in whatever amounts Lessee deems expedient, including the right to place and maintain injection wells on the Unit Area and to use any producing or abandoned oil or gas wells for said purposes. Royalty Owners further grant unto Lessee the right to drill for and/or extract subsurface waters underlying the Unit Area and to use the same for injection purposes anywhere within the Goldsboro Pool in Coleman and Runnels Counties, Texas. Lessee shall not be required to pay for water so used. Lessee shall also have the free use of any other water from the Unit Area for operations hereunder except water from Royalty Owners' wells, private lakes or ponds or irrigation ditches."

In reply to the action for cancellation, answers were made by two of the named "indispensable parties," The First National Bank of Abilene, Trustee under the will of S. M. Jay, and W. J. Fulwiler, Jr., who denied the allegations.

All other parties selected by the plaintiff to represent the class made default. No service was requested or had, or notice given to the other 66 signing parties to the Unitization Agreement. Pleas in abatement were filed, by reason of the absence of the parties to the agreement, and were overruled.

The plaintiff contends that the agreement had been superseded and cancelled in the main by the Plant Site Lease. This lease was signed by plaintiff and Climax Molybdenum Company and was delivered at the same time and as a part of the same transaction as the Unitization Agreement. The theory of plaintiff's ground for recovery is that the plant site and water use lease superseded and took precedence over all other instruments that were signed in the chain of negotiations, and controlled.

As is stated in Article 3, Sec. 3.5, the operators of the leases in the Goldsboro Unit may extract the subsurface waters underlying any part of the unit area and use the same for injection purposes, without payment. The plaintiff's petition attacked this contract and sought to cancel or alter it basically.

█ The rights of the signers of the Unitization Agreement were affected by the judgment of the court in a trial in which they were not parties, but should have been, in order that any defense that they may have had could be presented, and this was not done.

Plaintiff says that the royalty owners were joined through a class action, "for jurisdictional purposes only" and that "no personal money judgment" was sought against the royalty owners; plaintiff did expressly seek a declaration as to status of the royalty owners, and that the "free water" provisions of the Unitization Agreement had been superseded and annulled by another contract between himself and the unit operator.

In the case of Hill v. Carr, Tex.Civ.App., 307 S.W.2d 828, no writ history, the doctrine of indispensable parties is reiterated, and the case of Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, is cited, and is a case involving the rights of royalty owners under unitized mineral leases.

In Sharpe v. Land Owners Oil Ass'n., 127 Tex. 147, 92 S.W.2d 435, the Court said:

"It is settled beyond all quesion in this state that in a suit to cancel a written instrument all persons whose rights, interests, or relations with or through the subject-matter of the suit will be affected by the cancellation are necessary parties. * * * The absence of a necessary party in a suit for cancellation is fundamental and jurisdictional to such extent that it must be considered by this court."

In 1 McDonald, Texas Civil Practice, Sec. 3.16, p. 217, the following definition is set forth:

"An indispensable party is one who has or claims such a direct interest, legal or equitable, in the subject matter of the action or the relief sought that 'a final decree cannot be made without affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.' "

The proceeding as a class action was not sufficient as a joinder of indispensable parties to meet the test of the rule.

Rule 42(a) T.R.C.P., provides as follows:

"Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, * * *"

The history of class actions, both before and after the codification of Rule 42, is ably discussed in 1 McDonald, Texas Civil Practice, Sec. 334, pp. 269–279, and 1962 Pocket Part, pp. 81–88.

Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22, 132 A.L.R. 741, holds that an adequate representation in a class suit is essential to due process of law.

Knioum v. Slattery, Tex.Civ.App., 239 S.W.2d 865, er. ref., is the leading Texas case, deciding class representation and Rule 42.

The royalty owners were known to the plaintiff, since the testimony of an attorney is that he personally participated in persuading the royalty owners to sign the Unitization Agreement.

We recognize that class actions, handled in accordance with the requirements of due process, can be both useful and proper.

Appellants' seventh and eighth points are to the effect that the trial court erred in overruling motions for judgment because the written contracts executed and delivered at the same time constitute one overall transaction and are to be construed together, and expressly provided free use of all water.

On April 11, 1957, Mr. Robertson agreed to assign to Climax (predecessor in title to Blackwell, American Metal Climax, American Climax Petroleum Corporation and Amax Petroleum) the various oil and gas leases in what later was called the Goldsboro Unit. These leases included the Bright Lease covering 202 acres, which itself included the ten acre tract later described in a Plant Site Lease between Climax Molybdenum Company and Robertson.

In furtherance of this agreement during May 1957, Robertson secured the execution of the Unitization Agreement, the various lease, surface, mineral and royalty owners, and had such agreement approved by the Railroad Commission of Texas and executed the Plant Site Lease covering the ten acre tract.

Robertson plead the agreement to sell oil and gas properties and the contract between himself and his associates and Climax Molybdenum Company and introduced these agreements in evidence:

The agreement to sell oil and gas properties provided that Robertson and his associates were to sell and convey all improvements, easements, etc. useful for operating gas or other minerals to be produced from the lands. The contract provided:

"2. Robertson agrees that, if the Agreement is closed, Climax shall have the right on any portion of the lands owned by Robertson and described in Exhibits A and C to the Agreement to drill, equip and operate water wells and take water therefrom and use such water in secondary recovery operations on any portion or all of the tracts described in Exhibits A and C to the Agreement and on any and all other lands within the Goldsboro Pool in Coleman and Runnels Counties, Texas. Climax shall not be required to pay for water so obtained and used, and the liability of Climax for damages to the surface of the land caused by the drilling and equipping and operation of such water wells shall be limited to actual damage to growing crops other than pasture."

The closing date of the agreement was fixed at May 31, 1957.

The Unitization Agreement provided:

"3.1 Oil and Gas Rights Unitized. Subject to the terms and conditions of this Agreement, all the Oil and Gas Rights of the Royalty Owners in and to the lands described in Exhibit A and all of the Oil and Gas Rights of Lessee in and to said lands are hereby unitized in so far as said respective Oil and Gas Rights pertain to the Unitized Formation, all to the same extent as if the Unitized Formation had been included in a single lease executed by all the Royalty Owners, as lessors, in favor of Lessee, as lessee, and as if said lease had been subject to all of the terms and conditions of this Agreement."

We have inserted Section 3.5, Injection Rights, hereinabove.

"4.1 Waterflooding Operation. As soon as reasonably possible after the effective date of this Agreement, Lessee shall commence and carry on with reasonable diligence and in accordance with good engineering and production practices a waterflooding operation with respect to the Unitized Formation. The plan and method of such waterflooding operation shall be at the discretion of Lessee and Lessee shall be under no liability to Royalty Owners for any action in good faith taken or

omitted to be taken by Lessee in connection therewith.

\*   \*   \*   \*   \*   \*

10.1 Grant of Easements. The parties hereto, to the extent of their rights and interests, hereby grant to Lessee the right to use as much of the surface of the land within the Unit Area as may be reasonably necessary for the operation and development of the Unit Area hereunder."

In the lease from Robertson to Climax covering the Bright 202 acres, it is provided:

"Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for all operations thereon, except from water wells of lessor."

The Plant Site Lease covering the ten acres out of the 202 acre Bright tract provided for the drilling, equipping and operating of water wells, and maintaining a water supply plant in connection with secondary recovery operations anywhere, for oil storage, pump stations, houses for employees, and any other lawful activity incident to its operations in Coleman or Runnels Counties.

■ Mr. Robertson testified that the Unitization Agreement was a part of the whole trade effective June 1, 1957. The separate written instruments having been delivered at the same time and as a common understanding they will be construed together as one contract.

In Guadalupe-Blanco River Authority v. City of San Antonio, 145 Tex. 611, 200 S.W.2d 989, our Supreme Court wrote directly on this question.

■ The effect of the unitization was to merge all of the oil and gas leases into one contract and to vest all of the lessors with the right to participate in any royalty produced on any tract in the block. Belt v. Texas Company, Tex.Civ.App., 175 S.W. 2d 622, er. ref.

The operator had the right to use so much of the surface as was necessary. Warren Petroleum Corp. v. Martin, 153 Tex. 465, 271 S.W.2d 410, Supreme Court; Holt v. Southwest Antioch Sand Unit, Fifth Enlarged, Okl., 292 P.2d 998.

■ Since the contracts were in evidence, there was no fact questions and the trial court had the power and duty to interpret and apply them to the facts. Brown v. Payne, 142 Tex. 102, 176 S.W.2d 306, Supreme Court; Hill & Combs v. First Nat. Bank of San Angelo, Texas, 139 F.2d 740; Railroad Commission of Texas et al v. Manziel et al, 361 S.W.2d 560, Supreme Court.

Appellants assign as error the action of the Court in failing to hold that Robertson was estopped to question any part of the Unitization Agreement, and the continuing force and effect thereof.

There can be no question as to the execution of the Unitization Agreement and the Plant Lease by Mr. Robertson on the one hand and the other interested parties on the other hand.

The plaintiff is continuing to claim and hold under the leases, and to accept royalties paid by reason of the production of oil and gas produced under the agreement, and now insists that most of its terms are in full force.

■■ Generally a party who has accepted and retained the beneficial part of a contract is estopped to repudiate any disadvantageous part thereof; in this case, the right to the water, without cost. Guadalupe-Blanco River Authority v. City of San Antonio, supra; Lowe v. Ragland, 156 Tex. 504, 297 S.W.2d 668, Supreme Court.

There is the question of the ownership of the salt water, which is held to be a mineral, reserved in the deed from Mrs. Bright to Mr. Robertson, which must be determined. Cain v. Neumann, Tex.Civ.App., 316 S.W. 2d 915, no writ hist.; Cox v. Robison, 105 Tex. 426, 150 S.W. 1149; Flemming Foun-

dation v. Texaco, Tex.Civ.App., 337 S.W. 2d 846, er. ref. n. r. e.

Appellants' assignments Nos. 14, 15, 16, 17, 18, 19, 20 and 21 are directed to the action of the trial court in overruling appellants' motion for judgment because there was no evidence or the evidence was insufficient to show the amount of water taken from the salt water well, and no evidence or the evidence was insufficient to establish the amount of salt water injected into the wells on the Bright 202 acre tract, or into the input wells within the Goldsboro Unit, or into the input wells located on the off-setting tracts.

Plaintiff sought money damages based on the reasonable market value of the salt water produced from the Cambrian salt water well on the ten acre tract.

There was no positive evidence as to the amount of salt water taken from the well on the ten acre tract alone, but as to the total amount of salt water produced from the Gardner formation with oil and from the Cambrian formation, and no claim is made by plaintiff to the salt water from the Gardner sand.

M. L. Hagan, superintendent of Amax Petroleum Corporation, by deposition introduced into evidence by plaintiff, testified as to the injection and repressuring into the Gardner sand of salt water from the plant on the ten acre tract, and:

"Q What is being done with the water produced from the well on the Bright tract?

"A The water we are producing from that well is being injected into the Gardner sand.

"Q How?

"A It is produced into a central filtering tank, treated, we are mixing our produced water with the Gardner—or, with the Cambrian water, then it is pressured through our high pressure plant.

"Q Is any water being taken or used from the water well on the Bright tract and put into any wells located outside of the Goldsboro field in Coleman and Runnels Counties, Texas?

"A No, sir.

"Q Are you now obtaining additional production from the Goldsboro unit by reason of this water injection and secondary recovery operation, or not?

"A Yes, sir, we are.

"Q If you put salt water down into this oil formation, as that salt water drives the oil towards the bore hole the salt water will go towards the bore hole, won't it?

"A Yes.

"Q And as your water flood project proceeds, your salt water and your oil come back up through the oil well?

"A Only that salt water, where we have such an emergency, that which comes back, where none came by, and you have 100 per cent ideal where none comes back. We have some to bypass. When we have some to bypass that water, that water that didn't go back, we have to put it back down and push it back.

"Q Where you get water in this Gardner formation, or any other formation, that gets to your well hole, bore hole, it is going to come up with your oil?

"A Yes, you will produce it up.

"Q As you get it on top of the ground, you are going to separate it again?

"A Yes.

"Q And take that water and put it through your plant and put it back down there again?

"A That's right.

"Q When you get in a project that has Cambrian water, for example, and has your Gardner water above it that produces oil, you can go get the Cambrian water, bring it to the top of the ground, right?

"A And put it back down.

"Q Put it back in the Gardner, right?

"A Yes.

"Q It will come back to the top of the ground with some of your water, with your oil, right?

"A That's right.

"Q You take the water and separate it again and let your oil go to the purchaser?

"A Put it back down.

"Q Put it back down in the Gardner; so that you are circulating?

"A Circulating the water that is not doing any good.

"Q You are circulating it and keeping it on your unit?

"A That which is going into your well and coming back out this other well on your unit, you are circulating; that which goes into your injection and comes back out is being circulated. The water that didn't do much good is returned.

"Q Now, of all the water you have produced, whether it be from the Cambrian formation or from the Gardner sand, has it come from the well located on the Bright plant site lease?

"A No, sir.

"Q I see. Now, where does this seven million six hundred and fifty-five thousand barrels and a little more, that you have mentioned, where does this water specifically come from, other than the Gardner formation; does it come from other wells?

"A No, sir.

"Q Does it still come from this one water supply well that you have?

"A No, sir.

"Q Do you pipe it to your plant on this water supply well, where the—

"A No, sir.

"Q Well, would you tell me where it comes from?

*    *    *    *    *    *

"Q I see. Now, then, in other words, you are producing some salt water from your oil wells; is that it?

"A Yes, sir.

"Q And where does this water go to, sir?

"A It goes into our injection system.

"Q Now, how much water have your produced from sources other than the Bright lease, Mr. Hagan?

"A Through June, of 1962, we have produced seven million six hundred and seventy-five thousand three hundred and seventy-three barrels in the Goldsboro unit.

"Q From the what, sir?

"A Goldsboro unit. And we have taken quite an amount of water from S. G. Herring and Bristol Petroleum. That amount, I cannot answer.

"Q Where does this water come from, this seven million. six hundred and fifty-five thousand odd barrels?

"A From the producing horizon of the Gardner sand.

"Q And that is water that you put back into your plant, and, then, reinject; is that what you do?

"A Yes, sir."

Appellants' 22nd and 23rd points are directed to the action of the trial court in overruling appellants' motions for judgment because there was no evidence or the evidence was insufficient to establish the market value of the salt water used by appellants.

As we have stated, the suit was for the reasonable market value of the salt water taken and sold by the defendants from the Cambrian salt water well to operators other than defendants for use in input wells on land outside of the unit, and for water located within the unit.

We have hereinabove discussed the evidence as to amount of water used and such is applicable as to the value of such, and we will not restate such again.

■ There was evidence as to the sale of water to operators outside the unit for a price of 2½ cents per barrel on top of the ground, but this was only one instance, and does not meet the requirements to fix value. 17 Tex.Jur.2d 296, Damages, Section 234.

The 24th and 25th points are directed to the action of the trial court in refusing to apply the two year statute of limitation, Article 5526, Vernon's Ann.Civ.St.

The suit was filed June 12, 1962 by plaintiff and defendants pleaded the two year statute of limitations. We do not determine the limitation statute—whether the two year statute or the four year statute would apply.

The 26th, 27th and 28th points are directed to the action of the trial court in refusing to enter judgment for defendants because the jury found that the salt water had no market value in place and the amount of damages should have been limited to the value of the salt water above the ground less the reasonable cost of producing, using, etc. the water, and the jury having found that the cost of producing the water was greater than the value of the water on top of the ground.

The evidence of Mr. Robertson was that the salt water was 6 cents a barrel, without taking into consideration the costs, which would be 10 or 12 cents to produce.

The jury found that the reasonable market value of a barrel of water, without considering the costs of producing same was 2½ cents per barrel and further that the costs of production was 11 cents per barrel.

■ Generally, the damages in a conversion action is the actual loss, and in the absence of fraud, the measure of damages is the value of the property converted at the time of conversion and when and where it was converted. 14 Tex.Jur.2d 27–28, 30, Conversion 24, 26; Reynolds v. Mc-Man Oil & Gas Co., 11 S.W.2d 778, Comm. of App., opinion affirmed by the Supreme Court.

The 29th and last point of appellants is directed to the failure of the trial court to grant the motion for a new trial because of jury argument. We do not consider this point further since was are reversing and remanding the cause.

We have carefully considered the entire record and the briefs filed herein in behalf of all parties, appellants and appellee.

As we understand the record, the title to the Bright 202 acre tract, minerals and surface, is as follows:

|  | Surface |  |
| --- | --- | --- |
| Robertson |  | all |
|  | Minerals |  |
| Climax leasehold (working interest) | | ⅞ |
| Third parties | | 1/16 |
| Robertson | | 1/16 |

If the salt water which was produced from the Bright tract and for the value of which Robertson brought this suit, is a "mineral", then it is owned in the properties above stated, subject, however, to the provisions of the unitization agreement which, as we understand the record, all mineral estate owners executed.

██ It is our opinion that salt water is a mineral within the meaning of the phrase "oil, gas and other minerals" as used in the leases held by Climax and within the meaning of the word "minerals" used in the deed from Mrs. Bright to Robertson conveying the land but reserving the "minerals".

Authorities which support this opinion are State of Texas v. Parker, 61 Tex. 265 and Cain v. Newmann, 316 S.W.2d 915, San Antonio Civ.App., no writ history.

██ The salt water, then, would be owned by the parties in the proportions stated subject to the terms of the pooling agreement. Our understanding of the agreement is that it dedicated the salt water owned by the parties to the flooding project. If so, then all parties were entitled to have the salt water so used and for any damage resulting from a diversion of such waters they would be entitled to recover. If, however, only excess salt water was diverted and sold by Climax than such salt water, being a mineral, should be treated as oil royalty and the owners of such royalty be paid their proportionate share of the proceeds.

The judgment awarded Mr. Robertson is a judgment for $200,000.00, of which the sum of $33,877.73 was for water sold to others and $166,122.27 was for the wrongful use by the operator of water.

On a retrial, all parties at interest should be cited and given an opportunity to appear.

With regard to the annual rental of $20.-00, we do not consider the failure to pay such sum to be of such consequence to enable appellee to defeat the Unitization Agreement or to determine the ownership of the salt water.

The judgment of the Trial Court is reversed and the cause is remanded.

Reversed and remanded.

## ON MOTION FOR REHEARING

In the deed to the 202 acre Bright tract to appellee, Mrs. Bright reserved all of "oil, gas and other minerals." One half of such minerals are now concededly owned by third parties. Appellee claims to own one half of these minerals although no conveyance to him is shown.

In appellee's Motion for Rehearing it is pointed out that the leases executed by himself and Mrs. Bright, and assigned to the unit operator, are for oil and gas only and do not include other minerals.

The effect of this is not material. The unitization agreement was executed by appellee and Mrs. Bright and it defined "Royalty Owner" as including any party thereto who was the "owner of a mineral, royalty" etc.

Appellee and Mrs. Bright as owners of a mineral, salt water, under their land were bound by the agreement wherein it provided that the unit operator could extract subsurface water for certain purposes without paying therefor.

The fact that appellee may have owned more of the salt water than others who signed the agreement is of no consequence.

If, as held in our original opinion, relief is sought for conversion of salt water, i. e., not utilized as provided in the unitization agreement, then recovery should be prorated

accordingly as ownership of the mineral estate is established.

The motion is overruled.

Motion overruled.