**SOUTHERN FARM BUREAU CASUALTY INSURANCE COMPANY, Appellant,**

v.

**Francisco AGUIRRE, Appellee.**

**No. 10–84–155–CV.**

Court of Appeals of Texas, Waco.

April 25, 1985.

Rehearing Denied May 23, 1985.

Sidney H. Davis, Jr., Touchstone, Bernays, Johnston, Beall & Smith, Dallas, for appellant.

Mike Felber, Denbow, Wells, Williford & Felber, Fort Worth, for appellee.

HALL, Justice.

This is a worker's compensation case. Appellant insurance carrier, Southern Farm, challenges the sufficiency of the evidence to support jury findings that the specific injury of the appellee claimant, Francisco Aguirre, extended to and affect-ed his body generally and that such extension was a producing cause of his total incapacity. We hold the evidence is sufficient and we affirm the judgment.

The record reflects that appellee sustained an injury to three fingers on his right hand on October 7, 1979, while on the job at Farmer's Gin in Bardwell, Texas. As appellee was cleaning a piece of equipment, his hand got caught in the equipment resulting in the traumatic amputation of the distal portions of his right little (fourth) finger, ring (third) finger and middle (second) finger. He was hospitalized for a week immediately following the accident while physicians performed several surgical procedures on his fingers.

After his initial hospitalization, appellee returned to work for Farmer's Gin for approximately a month and a half, but his job was limited to "pushing a switch" with one finger. Appellee left his job at Farmer's Gin and returned to his home in Eagle Pass, Texas. He saw several physicians in that area because he was experiencing pain in his right hand. The doctors treated him for infection and swelling in his fingers and for poor circulation in his hand. In the early part of 1980, appellee went to San Antonio to seek medical treatment from Dr. Green, a hand surgeon. Dr. Green hospitalized appellee and performed surgery on his fingers in an attempt to cut some of the nerves in the fingers. The surgery was not successful in alleviating any of appellee's symptoms. In July of 1980, appellee went to work cleaning old paint on heavy machinery. He was not able to stay at this job for any longer than five or six weeks due to the intense pain and swelling he was experiencing in his hand. Appellee stated that he was unable to sleep well at night because of the pain and poor circulation in his hand.

In November of 1980, appellee was referred to Dr. Mozersky, a vascular surgeon. Dr. Mozersky examined appellee and offered a diagnosis of excessive sympathetic tone in the fingertips. He stated that this involves a group of problems com-

monly known as sympathetic dystrophies. He further testified that:

The sympathetic nerves are the nerves that control the tone of the blood vessels and the ability of the sweat glands to function. They usually are effector nerves in that they send messages to the blood vessels and the sweat glands, but in these patients [referring to appellee] the connections of the nerves get altered and they may also be receptor nerves and they produce pain in addition to excessive sympathetic discharge.

After a period of conservative treatment which did not prove effective, Dr. Mozersky performed a sympathectomy. A sympathectomy is a surgical procedure involving the division of the nerves in the sympathetic nervous chain. In this instance an incision was made under appellee's armpit and the first rib was removed giving the surgeon access to the sympathetic nervous chain. Dr. Mozersky removed the sympathetic fibers, but the operation did not achieve a complete sympathectomy. Appellee improved for a few weeks and then his condition returned to what it had been before the operation.

After the unsuccessful sympathectomy, appellee returned to Dr. Green for another operation on his hand in an attempt to improve the circulation. This procedure did not produce any relief either. Appellee received a series of injections in his neck from another physician, but this method of treatment did not result in any long-term improvement.

The evidence showed that appellant paid all of appellee's medical bills arising out of the injury to his hand. Appellant has also paid $17,559.18 in worker's compensation benefits to appellee representing 150 weeks of compensation for the loss of a hand at the applicable wage rate discounted because some of the payments were made in lump sums.

The jury found that appellee's injury extended to and affected his body generally and that the injury as extended was a producing cause of total incapacity beginning on the date of injury. The final judgment rendered by the court awarded 251 weeks of compensation benefits to appellee representing the difference between a total and permanent award of 401 weeks and the 150 weeks which had already been paid to appellee.

Appellant's first three points of error address the legal sufficiency of the evidence to support the jury's finding that appellee's injury extended to and affected his body generally. We have considered these points in light of the evidence and the inferences tending to support the finding and have disregarded all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). A review of the evidence on this particular issue under this standard of review indicates the following: Appellee testified that as a result of his injury he experiences constant pain, swelling, coldness, and poor circulation in his injured fingers and hand. He indicated that he has trouble sleeping at night as a result of the constant pain and has to keep his arm reposed in one position. He said that he has very little strength in his hand and that due to the pain he experiences he is able to use his right hand and arm very little. Appellee also testified that after the sympathectomy the right side of his face and his right arm ceased to perspire. Appellee stated that he does not have any feeling under his arm.

Portions of Dr. Mozersky's deposition were also read into evidence. Dr. Mozersky explained that the alteration of the sympathetic nervous function was caused by the traumatic amputation of the distal portions of appellee's fingers.

DIRECT EXAMINATION

"Q. [Is] that problem, the sympathetic nervous problem that you found in [appellee], one that is confined solely to the fingers, or does it affect the general well-being of his body?

"A. Well, it can produce tremendous pain, and you know, it's mediated by sympathetic nerves which run from the tips of his fingers all the way back to the spine. So I'm not

sure exactly what you're driving at, but it's a debilitating problem.

"Q. In your opinion, was that injury . . . to the three fingers, by reason of this mechanism you found, is that injury extended to and has it affected other parts of the body?

"A. It's affected his sympathetic nerves which are located in other parts of the body than his fingertips, but that's elementary. If I understand you correctly, I would have to say that.

\* \* \* \* \* \*

"Q. Following [the sympathectomy], what was done next in the way of treatment by you for this man's problems?

"A. He continued to have difficulty after his operation.

"Q. What complaint was he making . . .?

"A. They were basically the same as his original complaints—coldness, painful finger, some swelling of the tips.

"Q. [I]s this something you just had to rely on him telling you?

"A. No, his fingertips were definitely cold to touch and showed evidence of poor blood flow. This is not simply a subjective diagnosis. . . ."

\* \* \* \* \* \*

CROSS EXAMINATION

"Q. So what you're talking about then—are we talking about a vascular condition as cause of the pain?

"A. No. We are talking about a problem with the nerves.

"Q. That caused something with—

"A. That caused spasm of the blood vessels.

"Q. Okay. So then, ultimately, it's something wrong with the blood vessels?

"A. Well, there is something wrong with the blood vessels, but they are the effector organ, not the cause of the problem. We know that there is a problem because the blood vessels are in spasm, but the nerves are not functioning properly. That's the reason they are in spasm.

"Q. Is that an improper function of the nerves in the fingers that caused the fingers to be cold or affect the blood vessels that caused the fingers to be cold?

"A. Yes. An improper function of the nerves causing the blood vessels and the fingers to go into spasm.

\* \* \* \* \* \*

REDIRECT EXAMINATION

"Q. Doctor, there was a question asked about the injury being confined to the fingers. [L]et me ask you to assume with me that 'injury' as used in this case means damage or harm to the physical structure of the body and such diseases or infection as naturally result therefrom, or the excitement, acceleration or aggravation of any disease, infirmity or condition previously or subsequently existing by reason of such damage or harm. If that's a definition of injury, Doctor, is it your opinion that the injury on October of 1979 was confined solely to his fingers?

"A. No. If that's a definition of injury, that doesn't account for the alteration of the function of the sympathetic nerves which is not a usual factor associated with injury.

Appellant argues that there is no evidence to support the jury's finding that the injury extended to and affected the body generally, but rather that the evidence conclusively establishes that the injury was confined to the hand or fingers. In support of this argument appellant relies upon *Texas Employer's Insurance Association v. Hartel,* 289 S.W.2d 380 (Tex.Civ.App.— Amarillo 1956, writ dism'd). In *Hartel* the claimant suffered an injury to three fingers on his left hand including the traumatic

amputation of the distal portion of the fourth finger, resulting in symptoms of traumatic neuritis. The treating physician stated that he "found damage to the nerve which extends from the end of the amputated finger clear on up through the brachial plexus into the brain." *Id.* at 383. The doctor testified that "the neuritis or the injury to the nerve originating in the fourth finger continued that pain...." *Id.* at 384. Further testimony from the physician in *Hartel* indicated the following:

"Q. Now, let's talk about that nerve injury just a little bit. Doctor, I believe you said now that it was injured only down here in this middle—that is the joint there—middle joint, is that correct, sir, where it was amputated?

"A. The joint, the bone between the joints, that would be the second phalange of the fourth finger.

"Q. And, of course, that is where this nerve was injured in this accident?

"A. Presumably so, yes. *Id.*

The court concluded that there was insufficient evidence to sustain the finding that the injury extended to claimant's arm. We distinguish *Hartel* from our case in that the injury in *Hartel* was indicative of traumatic neuritis, the inflammation of a nerve, and the injury was confined to the end of the nerve on claimant's amputated finger. The evidence in our case demonstrates that appellee's initial injury to his fingers extended to and affected the body generally because it altered the sympathetic nervous system's function, an "unusual factor" associated with the original injury according to the medical testimony. This alteration produced constant pain and swelling and produced spasm of the blood vessels causing coldness and poor circulation in appellee's hand. Our facts do not present a case where the claimant experiences the normal pain associated with the traumatic amputation of portions of his fingers. Rather, the evidence is demonstrative of the abnormal after-effects of such an injury when the injury extends to the sympathetic nervous system and affects or alters the function of the sympathetic nerves.

Appellee relies upon *General Accident Fire & Life Assurance Group v. Murphy,* 339 S.W.2d 392 (Tex.Civ.App.—Houston 1960, writ ref'd n.r.e.) to bolster his claim that the injury extended to and affected the body generally. *Murphy* presents an injury quite similar to appellee's since the claimant had the fourth, third and second fingers injured and the distal portion of the fourth finger was traumatically amputated. The claimant experienced constant pain in his hand, arm, shoulder and back. The evidence demonstrated that the injury had caused damage to the sympathetic nervous system and that was the reason for constant pain. The claimant submitted to a ganglionectomy, the surgical removal of the second thoracic ganglion, in an attempt to slow the flow to the peripheral nerves. The court in *Murphy* noted that the claimant experienced constant pain without regard to the use of the injured member.

Appellant urged during oral argument that *Murphy* was overruled by *Travelers Insurance Co. v. Marmolejo,* 383 S.W.2d 380 (Tex.1964), but we disagree. *Marmolejo* stands for the proposition that a claimant must show that the injury which was sustained extended to and affected some part of his body other than the specific member and rejects those cases which are inconsistent with that holding. We conclude that *Murphy* is not inconsistent with that holding and note that the court in *Murphy* recognized and applied that principle by finding that the evidence was "reasonably susceptible to the construction that [the claimant's] body generally was *affected* by an *extension* into it of the effects of the injury to the fingers...." *Murphy,* 339 S.W.2d at 396 (emphasis added).

We recognize the principle that pain alone extending from an injury to a specific member of the body to other parts of the body does not by itself make the injury a general one. We think that appellant's proposition that subjective complaints alone are not enough to constitute an extension of the specific injury does not apply to this

case for two reasons. Initially, we note the fact that appellee's injury caused him to experience symptoms which were more than mere subjective complaints of pain and Dr. Mozersky testified that this injury did not constitute "simply a subjective diagnosis." Secondly, the evidence affirmatively establishes a causal link between appellee's problems with constant pain, swelling, coldness, poor circulation, and loss of sleep with the extension of the injury into the sympathetic nervous system.

■ We hold the evidence was legally sufficient to support the jury's finding on injury extension because the evidence demonstrates that the initial injury to appellee's fingers extended to and affected the sympathetic nervous system and was not confined solely to the hand.

Appellant's second contention is embodied in its remaining four points of error. Appellant asserts that the evidence was legally insufficient to support the jury's finding that appellee's injury as extended to his body generally was a producing cause of total incapacity. It is argued that "all of the evidence in the record as to appellee's incapacity compels the conclusion that such incapacity was caused solely by appellee's incapacity to his right hand and fingers." We disagree with this argument and hold that the evidence was legally sufficient to support the questioned finding.

We have already noted the extent of appellee's injury and the fact that he was unable to keep a job because of the constant pain he experienced. He stated in his deposition that even when he used primarily his left hand at the job he secured for a short time in Eagle Pass, his right hand would swell and the pain would increase to a point where he could no longer bear to work.

The evidence brought forth from Dr. Mozersky's deposition also shed light on this issue of incapacity and producing cause.

DIRECT EXAMINATION

"Q. Doctor, let me ask you to assume that the legal definition of total incapacity does not imply absolute inability to perform any usual tasks of a worker, not merely the usual tasks of any particular trade or occupation to such an extent that he or she cannot get and keep employment.

And assume further that the entire history you've obtained from [appellee] and assuming your clinical findings and your observations and assuming the treatment you prescribed and his response or lack thereof of that treatment, based on your observation, assuming all of these facts, do you have an opinion as to whether or not [appellee] meets that definition of incapacity?

"A. Well, I would presume that it would be very difficult for [appellee] to do gainful labor with the pain he has in his fingers. I'm sure it's a very severe pain, but that's about all I can say about it.

"Q. Could [appellee], in your opinion at this time, pass a preemployment physical to do a job requiring him to do the usual tasks of a worker?

"A. When you say worker, are you talking about a manual worker?

"Q. Yes. I assume that's all he's ever done—sixth grade education.

"A. I would say that it would be very difficult for him to do that.

\* \* \* \* \* \*

"Q. All right. Doctor, assume with me that 'producing cause' means an injury or condition which either independently or together with one or more other injuries or conditions results in incapacity without which such incapacity would not have occurred when it did. Assume that it is the definition of causation. Do you have an opinion as to whether or not the injury that I've asked you to assume—to the fingers ... was a producing cause of this incapacity or condition we've described.

"A. I believe it was.

\* \* \* \* \* \*

CROSS EXAMINATION

"Q. And, of course, you're not saying that somebody could not do manual labor just because they have a finger missing or part of a finger missing?

"A. No, I am not saying that. I think the reason he can't do manual labor is because he has a sympathetic dystrophy which is making his amputated stumps cold and painful.

"Q. So is his inability to work, then, caused by the pain that's in those three fingers?

"A. I would say that's the reason why he cannot work.

■ Appellant argues that the evidence conclusively establishes that appellee's inability to use the fingers on his right hand because of the pain and swelling is the sole cause of any incapacity which he now has, and therefore appellee's recovery must be limited to the specific injury award for loss of the hand. We disagree.

■ Appellant relies on the rule set forth in *Texas Employer's Insurance Association v. Wilson*, 522 S.W.2d 192, 194 (Tex.1975), that "[w]hen an injury has been sustained by a particular member of the body for which the Workmen's Compensation Act provides a specific measure of compensation, the liability of the insurance carrier is limited to the statutory amount, even though the loss of or injury to that particular member actually results in total and permanent incapacity of the employee to work." Nevertheless, a claimant is not precluded from recovery for total and permanent incapacity if he can allege and prove that the specific injury extended to and affected other portions of his body or has damaged his general health to such an extent as to result in total and permanent incapacity. *Id.; Western Casualty and Surety Company v. Gonzales*, 518 S.W.2d 524 (Tex.1975).

■ The evidence in our case demonstrates that the injury extended to the sympathetic nervous system thereby affecting the function of the sympathetic nerves producing symptoms which resulted in appellee's total and permanent incapacity. This incapacity is not caused merely by the loss of use of appellee's hand or fingers, but is caused by the constant intense pain he experiences regardless of whether he attempts to use the hand and fingers. The abnormal amount of pain is traceable to the extension of the original injury to appellee's sympathetic nervous system. Although the evidence does show that the symptoms of this extension may be manifested primarily in appellee's hand and fingers, this does not alter the fact that the original injury did extend to and affect the sympathetic nervous system and that the symptoms result from this extension. The pain produced by the extension caused an impairment of appellee's general ability to work resulting in total and permanent incapacity. *See Standard Acc. Ins. Co. v. Williams*, 14 S.W.2d 1015, 1016 (Tex.Com'n. App.1929); *Coleman v. Hartford Accident & Indemnity Company*, 297 S.W.2d 236 (Tex.Civ.App.—Fort Worth 1956, writ ref'd). Competent evidence supported the jury's determination that the incapacity was caused by the extension of the original injury to the sympathetic nervous system.

Finally, it has been held that the Worker's Compensation Act should be construed liberally in favor of the claimant and any doubt the reviewing court may have as to whether the evidence actually supports the jury finding of permanent incapacity must be resolved in favor of the right of the injured worker to receive compensation. *Hargrove v. Trinity Universal Ins. Co.*, 256 S.W.2d 73 (Tex.1953); *Travelers Insurance Company v. Arnold*, 378 S.W.2d 78 (Tex.Civ.App.—Dallas 1964, no writ).

Appellant's points and contentions are overruled.

■ Appellee asserts in a cross point that this court should assess an additional ten percent penalty against appellant because this is a frivolous appeal filed only for purposes of delay. We are not willing to characterize this appeal as frivolous be-

cause we think appellant has raised sincere questions concerning the legal sufficiency of the evidence. *Texas Employers Ins. Assn. v. Campos,* 666 S.W.2d 286 (Tex.App. —Houston [14th Dist.] 1984, no writ); *Liberty Mut. Ins. Co. v. Mariner,* 567 S.W.2d 69 (Tex.Civ.App.—Houston [14th Dist.] 1978, no writ); *Texas Employers Insurance Association v. Creswell,* 511 S.W.2d 68 (Tex.Civ.App.—Eastland 1974, writ ref'd, n.r.e.); T.R.C.P. 435 and 438.

The judgment is affirmed.