753 N.W.2d 785 (2008)
276 Neb. 236
Michael E. STACY, appellant,
v.
GREAT LAKES AGRI MARKETING, INC., appellee.
No. S-07-1000.
Supreme Court of Nebraska.
July 25, 2008.
*790 Jeffry D. Patterson, of Battle & Geier Law Firm, Lincoln, for appellant.
D. Steven Leininger and Sonya K. Koperski, of Leininger, Smith, Johnson, Baack, Placzek & Allen, Grand Island, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.
Michael E. Stacy was employed by Great Lakes Agri Marketing, Inc., doing business as Bridgeport Tractor, when he sustained an injury in the course of and arising out of his employment. Specifically, Stacy was removing a part from a tractor when a piece of metal struck him near the right knee, causing a nondisplaced fracture of his medial condyle. Stacy developed deep vein thrombosis in his right leg, and it is not disputed that Stacy requires anticoagulation therapy for the foreseeable future. The primary issue presented in this workers' compensation appeal is whether the diagnosis of a complex pain disorder in Stacy's right leg, or his need to take anticoagulant medications, has resulted in an injury to his body as a whole instead of to a scheduled member. Because the evidence is sufficient to support the Workers' Compensation Court's finding of a scheduled member injury, we affirm its judgment.

BACKGROUND

STACY'S WORK HISTORY
Stacy graduated from high school in 1983 and joined the Marine Corps. He served 4 years as a combat engineer, doing construction work and demolitions. After he was honorably discharged, Stacy and his wife had a flooring business in Chadron, Nebraska, installing carpet, tile, vinyl, and laminate flooring.
Stacy and his wife moved to the area of Bridgeport, Nebraska, in January 2004 and planned to continue in the flooring business. But they needed additional income, so Stacy obtained the job at which he was injured. Stacy's primary duties involved removing tractor parts and cleaning them for resale. Stacy was injured on July 21 while using a sledge hammer to remove a broken axle, when a piece of metal flew off the tractor and hit him in the leg below the right knee.

MEDICAL EVIDENCE
About 3 weeks after the accident, Stacy was still suffering from swelling in his right leg. He was admitted to the hospital, and blood clotting was discovered, which was treated with heparin, Coumadin, and compression hose. In September 2004, Stacy began to suffer from "hypersensitivity" in his leg. Stacy testified that
[b]efore it was just the swelling and kind of stiffness and that, and it  it started getting so it was like needles. I don't know how to really explain it, what I've tried to say before is, like when you've been out in the cold and your hands get really, really cold out in the wintertime and you come inside and stick your hands under hot water, that instant  feels like a bunch of little needles stickin' in your leg. And that's what my leg started to feel like.
*791 In late September 2004, Stacy's treating orthopedic surgeon, Dr. Bryan Scheer, diagnosed Stacy with reflex sympathetic dystrophy (RSD), which can be briefly described as an excessive or abnormal response of the sympathetic nervous system following an injury.[1] On October 27, Scheer released Stacy to sedentary work, but not to drive, stand on the job, or "other activity."
Stacy was evaluated at the Mayo Clinic Vascular Center in January 2005 by Dr. Mark Costopoulos. Costopoulos found evidence of both chronic and acute deep vein thrombosis in the right leg and, at the least, postphlebitic syndrome in the right leg. Costopoulos prescribed prescription-strength compression hose and continued Coumadin anticoagulation therapy. And Costopoulos concluded that Stacy "will need lifelong Coumadin anticoagulation for this problem for as long as he can take the medication relatively safely and reliably." Costopoulos noted that workers* compensation case evaluations were not performed at the Mayo Clinic, so Stacy's "return to work evaluation" was deferred to Stacy's primary care physician and workers' compensation insurer.
Back in Nebraska, on June 27, 2005, Scheer observed "an atrophic leg that is very dysthetic and painful." Scheer also observed "some skin color changes" and that Stacy's calf was "tender and very small when compared to the opposite side." Scheer reported that Stacy and his wife asked Scheer to consider amputation of Stacy's right leg. Scheer encouraged pain management techniques, but concluded Stacy's prognosis was "poor." Scheer "withheld any issues regarding [maximum medical improvement] at this point." In August 2005, Scheer directed Stacy to remain off work until further notice, based on a representation from either Stacy or Stacy's wife that Stacy was physically unable to work.
Dr. Bruce Lockwood evaluated Stacy in September 2005. Lockwood is board certified in physical medicine and rehabilitation, and in electrodiagnostic medicine. After the September examination, Lockwood did not believe Stacy was at maximum medical improvement, although "ascertaining that time is exceedingly difficult." Lockwood testified that "a reasonable diagnosis at the time would have been a tibial nerve injury causing the innervation in the muscles that it innervated." Lockwood thought there was "probably" also a perineal nerve injury, and Lockwood thought "there was an issue addressing, which wasn't firm in [Lockwood's] mind, whether or not [Stacy] had CRPS type I or RSD." Lockwood explained that CRPS was "chronic regional pain syndrome" and that CRPS type I described, essentially, RSD. But Lockwood did not finalize that diagnosis. Lockwood also noted a deep vein thrombosis in Stacy's right leg, with probable postphlebitic syndrome, and said Stacy would need anticoagulation treatment for the foreseeable future.
At a followup discussion on November 16, 2005, Lockwood discussed with Stacy, "very candidly," that Lockwood had concerns about noncompliant behavior. Lockwood did not conduct another physical examination. Lockwood's notes indicate that Stacy was resistant to an electromyogram because Stacy's previous electromyogram, at the Mayo Clinic, had been painful. Lockwood was unable to contact Stacy after November 16 and pronounced *792 him at maximum medical improvement. Lockwood concluded Stacy was being noncompliant and stated that "[i]n light of what would appear to be consistent and repeated noncompliant behavior, it would appear as though he is at maximum medical improvement, based on the information made available to [Lockwood]." Lockwood also assigned an impairment rating, based on an RSD diagnosis, of 9-percent impairment to the body as a whole. But Lockwood altered that rating in response to a request from Stacy's case manager. Lockwood noted, in his letter to the case manager, that "[i]t would appear as though [the case manager is] asking [Lockwood] to convert the 9% whole person impairment to an extremity impairment." He converted the rating to a 22- or 23-percent lower extremity impairment.
Lockwood testified that there was no indication Stacy's accident resulted in physical injury other than to his right leg and that "[w]ith reluctance," he had given Stacy an impairment rating. Lockwood later withdrew his impairment rating at his deposition, because although he "was asked to do it" and gave his best effort, he did not "think that's reasonable to stand by." Lockwood testified that there was no physical injury to Stacy's body other than to his right leg and that he was not "comfortable" diagnosing Stacy with a physical injury to his sympathetic nervous system. However, Lockwood opined that if Stacy had a "sympathetic or an RSD situation," such an injury would be classified as an extremity injury.
On December 2, 2005, Scheer wrote Bridgeport Tractor's workers' compensation insurer, stating that Stacy "is requesting he be placed at [maximum medical improvement] which I think is reasonable." In a letter dated December 29, 2005, Scheer opined that Stacy's deep vein thrombosis, "his chronic lower extremity pain, his complex regional pain syndrome, and his medial condyle fracture are, within a reasonable degree of medical certainty, related to his injury." Scheer opined that Stacy would need future medical care for chronic pain and the poor function of his right leg. Scheer rated Stacy's right leg as 100-percent impaired and opined that although it would be difficult to assess Stacy's permanent work restrictions, Scheer thought Stacy would
have little use of his right lower extremity, including vigorous labor, heavy lifting, ladders, etc., but he should be able to be retrained in another profession. Also, his anticoagulation therapy and his weakness would limit it, as well as his pain syndrome may limit his employment opportunities.
On December 22, 2005, Bridgeport Tractor's workers' compensation insurer had informed Stacy, through Stacy's counsel, that Stacy had been placed at maximum medical improvement by Lockwood, with a 22- to 23-percent impairment of the right lower extremity. A final lump-sum payment for permanent partial disability was made on that basis.
On July 20, 2006, Scheer opined that
transient sedentary activity without prolonged standing or prolonged sitting is warranted. Certainly, he has a functional left lower extremity, bilateral upper extremity and I think he is a very bright man who could be vocationally rehabilitated to do many tasks, but labor, heavy lifting, squatting, bending, ladders, repetitive activity, prolonged standing, prolong [sic] sitting and others will likely have to be avoided for the foreseeable future if not permanently.
Scheer had "no doubt" about the diagnosis of RSD.
Dr. Lawrence Lesnak, a Colorado physician, board certified in physical medicine *793 and rehabilitation, examined Stacy on August 23, 2006. Lesnak found medical evidence to suggest deep vein thrombosis and postphlebitic syndrome in Stacy's right leg. Lesnak found "no indication whatsoever" that Stacy had RSD, also known as CRPS type I. Instead, Lesnak diagnosed Stacy with causalgia, also known as CRPS type II. Causalgia is briefly described as intense burning pain accompanied by trophic skin changes, due to injury of nerve fibers.[2] Lesnak opined that Stacy's symptoms were not "sympathetically mediated" and "in all likelihood are something strictly from this postphlebitic syndrome." Lesnak found that Stacy was at maximum medical improvement and assigned a 20-percent lower extremity impairment. Lesnak found no condition that involved Stacy's body as a whole, or any extremities other than his right leg.
When asked whether he disagreed that Stacy would require lifetime anticoagulation therapy, Lesnak said that it was "not a typical recommendation for someone who has had a single episode of deep venous thrombosis." But Lesnak did not have an opinion on whether lifetime anticoagulation therapy was required. Lesnak's impairment rating for Stacy's leg did not include causalgia or lifetime Coumadin treatment, because Lesnak concluded that "the postphlebitic syndrome was the ratable condition, not the causalgia." Lesnak conceded that revised American Medical Association guidelines might provide a basis for a "rating in and of itself for anticoagulation." But Lesnak believed that "if you rate postphlebitic syndrome, then you're basically double dipping if you rate Coumadin usage." Lesnak conceded that if Stacy continues on Coumadin treatment, he would need to avoid occupations that involved trauma to the body.
Stacy testified at trial that he still felt constant pain in his right leg and a shooting pain when he put weight on his right foot. Stacy explained that he could not squat, lift, or kneel with his right leg. He said that his walking pace had slowed considerably, he was unable to walk over rough surfaces, and he had difficulty even on smooth surfaces. Stacy said he could not get up without using a cane and could climb stairs only with a cane and handrail.

VOCATIONAL EVIDENCE
In November 2004, Stacy and David DeFoe, Bridgeport Tractor's store manager, began discussing the possibility of Stacy's returning to work. DeFoe told Stacy that transportation would be arranged for him. Stacy said he was told he would be assigned to use a computer to make "a map of the tractor place. Of where the tractors and parts were, in what area." Stacy said he was told that nothing else was planned and that he "could sit back on the couch and read a book or whatever." But Stacy testified that he was unable to return to work at that time.
DeFoe described the job as researching part numbers and proofreading a catalog that the company was preparing to print. DeFoe said that at the time, the position did not exist, but there had been previous discussion in the management group about creating a full-time position to do the research. DeFoe said the job was needed by the company and still was needed at the time of trial. And in November 2005, Stacy was offered a job that DeFoe said was essentially the same job, but expanded beyond the catalog to encompass the company's entire inventory of used parts. The *794 job was being held for Stacy and, in the meantime, had been filled with other employees at different stores.
Stacy testified that before his injury, his intent had been to work at Bridgeport Tractor only until he could get his flooring business reestablished. But after his injury, he could no longer perform the physical tasks that would be required in the flooring business, because he could no longer lift or kneel, or work with knives because of his anticoagulant regimen. Stacy said he would like to get back into the work force, but needed professional help because he could no longer do the kind of work he had done before.
Stacy testified that he had no computer training or experience, except that he had a computer at home that he used to "play Solitaire" and read e-mail. In Stacy and his wife's flooring business, Stacy's wife had used a computer for bookkeeping, but Stacy did not use the computer. Stacy also testified that he did not like computers and did not want to work with a computer. He explained, "I like to do things, where I can see something accomplished. I can't  I can't comprehend sittin' there at a computer all day long...." He testified that he had been doing manual labor his whole life and did not "want to go to work and be miserable" every day at a job he hated. Stacy said he wanted a job he thought he could succeed at and did not believe he could succeed at the jobs recommended to him by his vocational counselors.
Laren Roper, an occupational therapist, testified regarding a jobsite evaluation he performed in November 2004. Roper opined, based on his examination of the Bridgeport Tractor jobsite and his understanding of Stacy's physical restrictions, that Stacy could return to work and perform the duties of the computer job offered by Bridgeport Tractor. But Roper conceded that he was not a vocational specialist and did not determine whether the job was suitable for Stacy based on Stacy's education and aptitude.
Ronald Schmidt, the Workers' Compensation Court-appointed vocational rehabilitation counselor, evaluated Stacy's loss of earning power. Schmidt considered Stacy's work restrictions and surveyed the relevant labor market, but "was unable to identify any employment opportunities in... Stacy's geographic area that were consistent with not only the physical limitations but his education and vocational background." Schmidt concluded that Stacy's on-the-job injury "eliminated [his] earning capacity." Schmidt did not evaluate Stacy's candidacy for vocational rehabilitation because he concluded, as he had explained in a previous letter, that due to the job offered by Bridgeport Tractor, "the development of a vocational rehabilitation plan is not indicated at this time."
A rebuttal loss of earning power analysis was completed by Patricia Conway, a rehabilitation specialist, on September 27, 2006. Conway found that Stacy could perform sedentary jobs and had suffered a 50-percent loss of earning power. Conway recommended that Stacy either accept the job offered by Bridgeport Tractor or participate in appropriate vocational rehabilitation services. However, Conway noted that because Stacy "had been offered a physically appropriate job with the employer of injury, ... it would appear that he is not entitled to vocational rehabilitation services."

COMPENSATION COURT PROCEEDINGS
Trial was had before a single judge of the Workers' Compensation Court in October 2006. The single judge, relying on Lockwood's opinion, found that Stacy was temporarily totally disabled from the date of the accident until reaching maximum medical improvement on January 20, 2005. *795 The single judge found that Stacy's RSD affected his leg, producing a scheduled member injury, and that "[w]ith respect to the anticoagulation therapy, the Court is not persuaded that it produces any limitations in [Stacy] not already produced by the permanent impairment to [Stacy's] right leg." The single judge agreed with Scheer that Stacy's right leg was totally impaired.
But the single judge found that because of the available job with Bridgeport Tractor, Stacy was not entitled to vocational rehabilitation benefits. The single judge did find that Stacy was entitled to future medical care as was reasonable and necessary to treat his injury. And finally, the single judge awarded waiting-time fees based on Bridgeport Tractor's failure to pay benefits for approximately 6 weeks after the injury. But the court found a reasonable controversy to have existed with respect to the extent of Stacy's permanent impairment after his date of maximum medical improvement and did not award waiting-time penalties or an attorney fee for that period. The single judge awarded compensation for temporary total disability, and then for 100-percent permanent loss of a scheduled member, the right leg.
Stacy filed an application for review. The review panel found that the single judge's finding that Stacy suffered a scheduled member injury to his right leg was not clearly erroneous. The review panel found little evidence in the record to suggest that Stacy suffered whole-body consequences from deep vein thrombosis or RSD. The review panel affirmed the single judge's finding of the date of maximum medical improvement. And the review panel affirmed the single judge's refusal to award vocational rehabilitation benefits. Finally, the review panel affirmed the single judge's finding of a reasonable controversy regarding the extent of Stacy's permanent impairment. Stacy appeals.

ASSIGNMENTS OF ERROR
Stacy assigns, restated, that the Workers' Compensation Court erred in (1) refusing to award permanent disability benefits based on injury to the body as a whole, (2) failing to find that Stacy is entitled to permanent total disability benefits as a matter of law, (3) finding that Stacy reached maximum medical improvement on January 20, 2005, (4) not awarding vocational rehabilitation benefits, (5) finding a reasonable controversy regarding the extent of Stacy's permanent impairment, and (6) refusing to award an attorney fee on review.

STANDARD OF REVIEW
Pursuant to Neb.Rev.Stat. § 48-185 (Reissue 2004), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award.[3] In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of fact of the single judge who conducted the original hearing; the findings of fact of the single judge will not be disturbed on appeal unless clearly wrong.[4]

*796 ANALYSIS

INJURY TO BODY AS A WHOLE
In support of his first assignment of error, Stacy argues that his diagnosed medical conditions  deep vein thrombosis and RSD  should have been found by the compensation court to result in injury to his body as a whole. Stacy argues that although his initial injury was to a scheduled member, the resulting conditions impair his body as a whole. But the medical evidence in the record does not support Stacy's argument.
Stacy begins by arguing, based on the medical evidence and his own testimony, that his deep vein thrombosis affected his entire circulatory system, not just his right leg. Although medical restrictions or impairment ratings are relevant to a workers' compensation claimant's disability, the trial judge is not limited to expert testimony to determine the degree of disability, but instead may rely on the testimony of the claimant.[5] But here, none of the medical experts whose testimony was presented to the single judge opined that Stacy had suffered a whole body impairment. Nor did Stacy's own testimony establish any whole body impairment caused by his deep vein thrombosis.
The test for determining whether a disability is to a scheduled member or to the body as a whole is the location of the residual impairment, not the situs of the injury.[6] In the absence of evidence establishing that Stacy's deep vein thrombosis caused impairment to the body as a whole, we cannot say that it was clearly wrong for the single judge to find that Stacy's deep vein thrombosis was compensable as an aspect of his scheduled member injury.[7]
Stacy calls particular attention to his need for anticoagulant therapy and argues that the effect of his anticoagulant regimen is, in effect, a whole body impairment. He argues that "acquired thrombotic disorder," resulting from anticoagulant therapy, is a diagnosable condition.[8] That may be, but there is no evidence establishing that diagnosis here, or any resulting impairment of Stacy's body as a whole.
In order to recover under the Nebraska Workers' Compensation Act,[9] a claimant has the burden of proving by a preponderance of the evidence that an accident or occupational disease arising out of and occurring in the course of employment proximately caused an injury which resulted in disability compensable under the act.[10] A proximate cause is a cause that produces a result in a natural and continuous sequence and without which the result would not have occurred.[11] In workers' compensation cases, a distinction must be observed between causation rules affecting the primary injury and causation rules that determine how far the range of compensable consequences is carried, once the primary injury is causally connected with the employment.[12]
When the question is whether compensability should be extended to a subsequent injury or aggravation related *797 in some way to the primary injury, the rules that come into play are essentially based upon the concepts of "direct and natural results."[13] A cause of an injury may be a proximate cause, notwithstanding that it acted through successive instruments of a series of events, if the instruments or events were combined in one continuous chain through which the force of the cause operated to produce the disaster.[14]
We recognize that several courts have, in determining the extent of a claimant's impairment and disability, considered the effects of medication necessary to treat a compensable condition.[15] There is no reason, under the causation principles set forth above, why the effects of medical treatment could not be a direct and natural result of a compensable injury. But the record before us in this case does not evidence any such effects, to the extent necessary to establish as a matter of law that Stacy has suffered a whole body impairment. As the single judge noted, the requirement that Stacy avoid a risk of trauma is subsumed in the other work restrictions imposed by his deep vein thrombosis and RSD. And more importantly, neither the medical testimony nor Stacy's own testimony established an impairment to the body as a whole.
Stacy next argues that his RSD is a disease of the entire nervous system, not just his right leg. He contends that "both of [Bridgeport Tractor's] experts agreed that [RSD] is a condition impairing the sympathetic nervous system."[16] But the expert testimony presented to the single judge does not support that construction. While Lockwood testified that RSD can spread, there was no evidence that Stacy's RSD has actually impaired any part of his body other than his right leg. Courts in other jurisdictions have found evidence, in some cases, that RSD has caused impairment to a claimant's body as a whole.[17] But such decisions have been based on evidence showing that those claimants' RSD had spread beyond a particular scheduled member.[18] None of that authority supports Stacy's contention that RSD, as a matter of law, necessarily produces whole body impairment. And the evidence adduced here does not prove, as a matter of law, that Stacy suffers from whole body impairment.
The medical conditions affecting Stacy are complex and may involve "injury" to his circulatory and central nervous systems, but, as previously noted, it is the location of the impairment, not the injury, that determines whether a claimant's impairment is to a scheduled member or to the body as a whole.[19] And while the basic principles of causation on which Stacy relies are sound, the evidence here is sufficient to support the single judge's determination that Stacy's deep vein thrombosis and RSD resulted in impairment only to a scheduled member. Stacy's first assignment of error is without merit.

*798 PERMANENT TOTAL DISABILITY BENEFITS
In his second assignment of error, Stacy contends that he was entitled to permanent total disability benefits as a matter of law. A determination as to whether an injured worker has had a loss of earning power is a question of fact to be determined by the Workers' Compensation Court.[20] Stacy takes issue with Conway's and Schmidt's assessments of Stacy's loss of earning capacity, because those opinions were based, in part, on the availability of a job for Stacy at Bridgeport Tractor.
This argument does not succeed for two reasons. First, it was not incorrect to consider the availability of a job at Bridgeport Tractor in evaluating Stacy's loss of earning power. While the inquiry into loss of earning power includes an employee's ability to obtain employment generally, neither the single judge nor the vocational rehabilitation specialist should be expected to disregard a job that an employee actually has.[21] And there is no suggestion, in the record or Stacy's brief, that Bridgeport Tractor's offer of employment is not genuine.
But more importantly, Stacy's claim for permanent total disability benefits is dependent on the argument, which we rejected above, that Stacy suffered an injury to the body as a whole. Permanent total disability benefits are not generally available for a single scheduled member injury.[22] And as discussed above, the record does not establish that the injury to Stacy's right leg resulted in an unusual or extraordinary condition as to other members or other parts of the body.[23] Therefore, Stacy's second assignment of error is also without merit.

DATE OF MAXIMUM MEDICAL IMPROVEMENT
Stacy argues that the single judge erred in relying on Lockwood's testimony to set Stacy's date of maximum medical improvement as January 20, 2005. The date of maximum medical improvement for purposes of ending a workers' compensation claimant's temporary disability is the date upon which the claimant has attained maximum medical recovery from all of the injuries sustained in a particular compensable accident. A claimant has not reached maximum medical improvement until all the injuries resulting from an accident have reached maximum medical healing.[24] And generally, whether a workers' compensation claimant has reached maximum medical improvement is a question of fact.[25]
Stacy notes that after examining him in September 2005, Lockwood was unable to conclude that he was at maximum medical improvement. But in his November medical report, Lockwood clearly articulated the basis for his conclusion that Stacy had reached maximum medical improvement on January 20. Lockwood explained that "[t]o specifically ascertain an appropriate date of maximum medical improvement is very difficult, but it would appear as though over the last approximately 10 months his care has been supportive care, i.e., maintenance care. Thus, a reasonable date in hindsight of maximum medical improvement would be January 20, 2005." *799 Lockwood acknowledged that "this is a difficult calculation to make, but again, based on the information made available to me, this would appear to be appropriate."
Stacy notes that Scheer disagreed with Lockwood's opinion. But Lockwood explained the basis for his opinion, and the single judge is entitled to accept the opinion of one expert over another.[26] Stacy did not present evidence of any meaningful change in his condition that occurred after January 20, 2005. We cannot say the single judge was clearly wrong in finding that Stacy had reached maximum medical healing on that date. Therefore, we find no merit to Stacy's third assigned error.

VOCATIONAL REHABILITATION BENEFITS
Vocational rehabilitation benefits are properly awarded when an injured employee is unable to return to the work for which he or she has previous training or experience.[27] Whether an injured worker is entitled to vocational rehabilitation is ordinarily a question of fact to be determined by the Workers' Compensation Court.[28] Stacy contends that despite the available job at Bridgeport Tractor, he should have been awarded vocational rehabilitation benefits.
But both of the vocational rehabilitation specialists whose opinions were presented to the single judge opined that because of the Bridgeport Tractor job, vocational rehabilitation services were not warranted.[29] And more importantly, Stacy's argument is inconsistent with the priorities that the Nebraska Workers' Compensation Act directs the Workers' Compensation Court to use in developing and evaluating a vocational rehabilitation plan. Those priorities are, listed in order from lower to higher priority:
(a) Return to the previous job with the same employer;
(b) Modification of the previous job with the same employer;
(c) A new job with the same employer;
(d) A job with a new employer; or
(e) A period of formal training which is designed to lead to employment in another career field.[30]
No higher priority may be utilized "unless all lower priorities have been determined by the vocational rehabilitation counselor and a vocational rehabilitation specialist or judge of the compensation court to be unlikely to result in suitable employment for the injured employee that is consistent with the priorities listed."[31]
Stacy is seeking vocational rehabilitation training that could lead him to employment in another career field. The record demonstrates that Stacy is unable to perform his previous job with Bridgeport Tractor, even if it were modified. But the record also demonstrates that a new job at Bridgeport Tractor is available to Stacy. There is nothing in the record to suggest that Bridgeport Tractor's offer of employment is insincere. And the training Stacy seeks is not available, pursuant to § 48-162.01(3), unless "[a] new job with the same employer" is "unlikely to result in suitable employment for the injured employee."[32] *800 Stacy's frustration with his employment opportunities and medical condition is apparent from the record, and completely understandable. But it is clear from the medical evidence that no amount of vocational rehabilitation can enable Stacy to perform the kind of work he enjoyed before his accident. And while the job available at Bridgeport Tractor may not seem ideal, Stacy is physically capable of performing it, and the Nebraska Workers' Compensation Act establishes priorities for postinjury employment that neither this court nor the Workers' Compensation Court are at liberty to ignore.
When the requirements of § 48-162.01(3) are considered, the record supports the single judge's finding that because a new job with Bridgeport Tractor was available to Stacy, further vocational rehabilitation services were not warranted. Stacy's fourth assignment of error is without merit.

REASONABLE CONTROVERSY
Stacy contends that the single judge erred in finding a reasonable controversy regarding the extent of Stacy's permanent impairment. Stacy complained to the single judge about Bridgeport Tractor's failure to pay indemnity benefits between December 22, 2005, and July 27, 2006. Stacy contends that there was no reasonable controversy regarding his entitlement to benefits, because the medical opinions upon which Bridgeport Tractor relied were flawed. And § 48-125 authorizes a 50-percent penalty payment for waiting time involving delinquent payment of compensation and an attorney fee, where there is no reasonable controversy regarding an employee's claim for workers' compensation benefits.[33]
But to avoid the penalty provided for in § 48-125, an employer need not prevail in the employee's claim  it simply must have an actual basis in law or fact for disputing the claim and refusing compensation.[34] A reasonable controversy under § 48-125 may exist, for instance, if the properly adduced evidence would support reasonable but opposite conclusions by the Workers' Compensation Court concerning an aspect of an employee's claim for workers' compensation, which conclusions affect allowance or rejection of an employee's claim, in whole or in part.[35] And whether a reasonable controversy exists under § 48-125 is a question of fact.[36]
Here, the existence of a reasonable controversy is evidenced by Lesnak's opinion, assigning Stacy a 20-percent lower extremity impairment. And Bridgeport Tractor's termination of benefits and its final lump-sum payment were based on Lockwood's assignment of a 22- or 23-percent lower extremity impairment. Lockwood later changed his opinion, and at trial, the single judge found Scheer more persuasive than Lockwood or Lesnak with respect to Stacy's impairment rating. Stacy now argues that Lockwood's and Lesnak's opinions were so lacking in foundation that they should not have been considered at all.
*801 But Stacy has not assigned error to the admission of that evidence, so his complaints about foundation go to weight, not admissibility. And although those opinions were ultimately unpersuasive, that does not mean that the single judge was clearly wrong in concluding that they at least established a reasonable controversy regarding Stacy's impairment rating.[37] Given the conflicting medical evidence, the single judge's finding of a reasonable controversy is supported by the evidence. We find no merit to Stacy's fifth assignment of error.

ATTORNEY FEE ON REVIEW
Finally, Stacy argues that he should have been awarded an attorney fee on review, because he appealed to the review panel and obtained an increase in his award. If an employee files an application for a review before the compensation court of an award by a judge of the compensation court when the amount of compensation due is disputed, and obtains an increase in the amount of such award, the compensation court may allow the employee a reasonable attorney fee to be taxed as costs against the employer for such review.[38]
The issue here arose when Bridgeport Tractor presented the single judge with a summary of the benefits it had paid Stacy. That summary reflected an overpayment of $838.07. Stacy objected to the claimed overpayment, arguing that the attached documentation had been interpreted incorrectly and that two payments had been double-counted. Bridgeport Tractor was unable to immediately resolve the matter, so the single judge said, "I'll order payments if appropriate and I won't make a finding on credits. And I'll let you guys take that up with whoever. . . ." Stacy's counsel indicated that the parties "can figure it out." However, in the final award, the single judge mistakenly made a finding of the credit to which Bridgeport Tractor was entitled for payments already made, including the objected-to $838.07.
On review, the review panel found that because the single judge had agreed with the parties not to decide the matter of Bridgeport Tractor's credit, the single judge had erred in crediting Bridgeport Tractor for the objected-to $838.07. The review panel reversed the single judge's decision to that extent. But the review panel declined to award an attorney fee, reasoning that "the disallowance of a credit did not necessarily establish an increase in [Stacy's] Award, but only reserved the issue of the subject credit for future resolution."
Stacy argues that the review panel should have awarded an attorney fee. For purposes of this appeal, we assume, without deciding, that a disagreement over credit for voluntary payments could be a dispute over "the amount of compensation due" that may result in "an increase in the amount" of an award.[39] But we agree with the review panel that the reversal of the credit, in this case, did not result in an increase in the award, because the issue was reserved for future determination, not decided. Where the issue of a credit against the award is not decided by the single judge of the Workers' Compensation Court, the defendant is still entitled to receive credit for payments already made.[40] And here, the parties agreed with the single judge to reserve the issue. The *802 single judge's mistake was deciding the issue at all, and the review panel's disposition simply enforced the consensus that had been reached at trial.
Given that fact, there are two problems with Stacy's argument for an attorney fee. First, because the credit issue has not been finally decided, it is impossible to tell at this point whether or not Stacy's appeal could result in an increase in the award.[41] Second, and perhaps more fundamentally, the record does not establish that in this case, the amount of Bridgeport Tractor's credit was "disputed" within the meaning of § 48-125(2). The issue was not submitted to the single judge, and the record does not show whether Bridgeport Tractor disputed the issue before the review panel.
Absent any suggestion in the record that Bridgeport Tractor actually tried to persuade the court that it was entitled to credit for the purported $838.07 "overpayment," it is difficult to conclude that Bridgeport Tractor actually "disputed" the "amount of compensation due," as is necessary to authorize an attorney fee on review pursuant to § 48-125(2). There is no basis in § 48-125(2) to penalize Bridgeport Tractor for a mistake it neither asked the single judge to make nor asked the review panel to affirm. And the record before us contains no evidence that Bridgeport Tractor did either.
In short, the record does not establish that the purported over-payment has been disputed before the Workers' Compensation Court or that Stacy has, at this point, obtained an increase in the award as a result. The review panel did not err in declining to award Stacy an attorney fee. Therefore, Stacy's final assignment of error is without merit.

CONCLUSION
The evidence in this case is sufficient to support the single judge's finding of a scheduled member injury, because the evidence does not prove, as a matter of law, that Stacy's medical condition has resulted in impairment to his body as a whole. Nor did the single judge clearly err in setting Stacy's date of maximum medical improvement and declining to award permanent total disability or vocational rehabilitation benefits. The evidence supports the single judge's finding of a reasonable controversy regarding Stacy's disability. And the review panel did not err in declining to award an attorney fee on review. Therefore, the judgment of the Workers' Compensation Court is affirmed.
AFFIRMED.
NOTES
[1] See, generally, Taber's Cyclopedic Medical Dictionary (18th ed.1997); The Merck Manual of Diagnosis and Therapy (16th ed.1992).
[2] See, generally, Taber's Cyclopedic Medical Dictionary, supra note 1; The Merck Manual of Diagnosis and Therapy, supra note 1.
[3] Lowe v. Drivers Mgmt., Inc., 274 Neb. 732, 743 N.W.2d 82 (2007).
[4] Vega v. Iowa Beef Processors, 270 Neb. 255, 699 N.W.2d 407 (2005).
[5] See Frauendorfer v. Lindsay Mfg. Co., 263 Neb. 237, 639 N.W.2d 125 (2002).
[6] Ideen v. American Signature Graphics, 257 Neb. 82, 595 N.W.2d 233 (1999).
[7] See id.
[8] Brief for appellant at 20.
[9] Neb.Rev.Stat. §§ 48-101 to 48-1,117 (Reissue 2004, Cum.Supp.2006 & Supp.2007).
[10] Sweeney v. Kerstens & Lee, Inc., 268 Neb. 752, 688 N.W.2d 350 (2004).
[11] Id.
[12] Id.
[13] Id.
[14] Id.
[15] See, e.g., Anderson v. Harper's Inc., 143 Idaho 193, 141 P.3d 1062 (2006); Averill v. Dreher-Holloway, 134 N.H. 469, 593 A.2d 1149 (1991); Flannery v. Nassau County Police Dept., 26 A.D.3d 678, 809 N.Y.S.2d 652 (2006); Hulshouser v. Texas Workers' Comp. Ins. Fund, 139 S.W.3d 789 (Tex.App.2004).
[16] Brief for appellant at 22.
[17] See, Barton v. Nevada Poultry Co., 253 Iowa 285, 110 N.W.2d 660 (1961); Collins v. Department of Human Services, 529 N.W.2d 627 (Iowa App.1995); So. Farm Bureau Cas. v. Aguirre, 690 S.W.2d 672 (Tex.App.1985).
[18] See id.
[19] See Ideen, supra note 6.
[20] Hagelstein v. Swift-Eckrich, 261 Neb. 305, 622 N.W.2d 663 (2001).
[21] See Davis v. Goodyear Tire & Rubber Co., 269 Neb. 683, 696 N.W.2d 142 (2005).
[22] See § 48-121(3).
[23] See Zavala v. ConAgra Beef Co., 265 Neb. 188, 655 N.W.2d 692 (2003).
[24] Rodriguez v. Hirschbach Motor Lines, 270 Neb. 757, 707 N.W.2d 232 (2005).
[25] id.
[26] Lowe, supra note 3.
[27] Hagelstein, supra note 20.
[28] Willuhn v. Omaha Box Co., 240 Neb. 571, 483 N.W.2d 130 (1992). See, also, Green v. Drivers Mgmt., Inc., 263 Neb. 197, 639 N.W.2d 94 (2002); Cords v. City of Lincoln, 249 Neb. 748, 545 N.W.2d 112 (1996).
[29] Cf. Davis, supra note 21.
[30] § 48-162.01(3).
[31] Id.
[32] Id.
[33] See Soto v. State, 269 Neb. 337, 693 N.W.2d 491 (2005), modified on other grounds 270 Neb. 40, 699 N.W.2d 819.
[34] See Dawes v. Wittrock Sandblasting & Painting, 266 Neb. 526, 667 N.W.2d 167 (2003), disapproved in part on other grounds, Kimminau v. Uribe Refuse Serv., 270 Neb. 682, 707 N.W.2d 229 (2005).
[35] See Bixenmann v. H. Kehm Constr., 267 Neb. 669, 676 N.W.2d 370 (2004).
[36] Hobza v. Seedorff Masonry, Inc., 259 Neb. 671, 611 N.W.2d 828 (2000).
[37] Compare, e.g., Dawes, supra note 34; Mulder v. Minnesota Mining & Mfg. Co., 219 Neb. 241, 361 N.W.2d 572 (1985).
[38] See § 48-125(2).
[39] See id.
[40] See D'Quaix v. Chadron State College, 272 Neb. 859, 725 N.W.2d 558 (2007).
[41] See Dawes, supra note 34.