IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


SCOTT V. DRIVERS MGMT.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


MARIATOU SCOTT, APPELLANT,

V.

DRIVERS MANAGEMENT, LLC, APPELLEE.


Filed June 6, 2017.    No. A-16-393.


Appeal from the Workers' Compensation Court: J. MICHAEL FITZGERALD, Judge. Affirmed.

Mariatou Scott, pro se.

Bradley D. Shidler, of Werner Enterprises, Inc., for appellee.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Mariatou Scott had a work-related injury while employed by Drivers Management, LLC. The Nebraska Workers' Compensation Court awarded Scott temporary and permanent disability benefits, but denied future medical care and vocational rehabilitation services. Scott appeals the compensation court's determination that she reached maximum medical improvement (MMI) from all of her injuries. We affirm.

## BACKGROUND

Scott sustained her injury when stepping down from a bunk bed ladder in the cab of a truck on March 20, 2010, in Grove City, Ohio, while working as a student driver for Drivers Management. Scott initially filed a lawsuit for her injury in Georgia (where she was hired), but subsequently filed a petition with the compensation court in Nebraska on July 8, 2011, claiming

- 1 -

that she "fell off the top bunk bed of her truck and landed on her feet," causing injuries to her "lower back, groin, left ankle, left foot, left hip and right leg." Drivers Management filed its answer on July 14, alleging that any benefits to which Scott was entitled had been paid, and further alleging the existence of a preexisting condition and an intervening accident in August 2010.

Trial took place on December 11, 2015, with Scott participating by video conferencing. Numerous medical records were received. Scott testified that her "disability is multifaceted," that it was not just her knee, but also her low back and hips. She claimed she "was whole" when she went to work for Drivers Management, and now she is "bound to home[,]" and "cannot do anything." Scott said she only had one prior work injury in 1990 or 1991 when she injured her right hand and her low back while working for a military retirement facility in Virginia, "but that only lasted for two weeks."

On cross-examination, Scott was confronted with a series of medical record exhibits which predated the March 2010 injury. She was first referred to a medical record from Dr. Albert Murtland (exhibit 100), dated January 19, 1996, which noted Scott was 37 years of age at that time, and was seeking another opinion regarding her back, "with a long, long, long story" dating from January 1990 throughout the next 5 to 6 years. Dr. Murtland noted Scott's complaints of "dis[k] problems," that Scott was still fighting a compensation claim from a slip and fall while working in Virginia, and that she was continuing to have a chronic problem with her low back. The record indicated that Scott is "always talking about pain and not loss of function," and that Scott "is looking for a magic cure and there is none." Dr. Murtland stated that there were "many things that bother [him] about this one[,]" and that Scott handed him a "large book that she has composed and the various doctors that she has seen and opinions that have been rendered and I wonder why." When Scott was asked at trial if she agreed that this medical record showed she was continuing to have a chronic problem with her low back in 1996, Scott responded that the medical record was false.

Another medical record reflected that Scott had knee pain in December 2001. However, Scott testified at trial that she did not have knee pain at that time, but that she "was depressed, so - maybe I was feeling [sic] in my knee." In a record dated March 22, 2002, reference was made to pain involving Scott's knees and ankles, and noted that she has had multiple rheumatologic evaluations. Scott testified that she never had such evaluations. In response to a medical record dated January 2003 which indicated Scott was having intermittent pain in her back for 1½ years, Scott said that was from asthma pain and "has nothing to do with [her] condition now." Although the medical record noted complaints of pain radiating through her back, up the left side of the back of her neck and through the top of her head to her left temple, Scott again stated she "was not suffering from back pain[,]" rather, it was her asthma.

Another medical record dated August 2007 showed Scott having leg pain and chronic ankle swelling; however, Scott denied ever having ankle swelling before and disagreed with that entry in the medical record. A medical record from October 2009 indicated Scott had a chief complaint of pelvic pain into her back, and right leg radiculopathy for a month, "worse today." Scott said she "didn't suffer any of this[,]" and that she only had pain on her right side "because [she] lifted [and she] moved to Tennessee [and she] didn't have any pain what they're saying here." Scott testified

at trial that any medications she received at that time were because she had lifted heavy boxes moving from New York to Tennessee.

Based on medical records from Johnson City, Tennessee, where Scott was residing at the time, Scott reported on December 1, 2009, that she had pain in her back radiating down into her right leg, and groin pain radiating into her leg. Scott testified that her doctor suspected she had a hernia from lifting heavy boxes. That same month, Scott applied to work for C. R. England, another trucking company. This was the first trucking company Scott went to work for as a driver. As part of a "DOT physical," Scott had to complete a health history. On that form, dated December 13, 2009, Scott denied ever having any injuries or problems with her neck, back, feet, legs, knees, or ankles. When it was suggested those were not truthful responses, Scott testified they were truthful because she did not have a "chronic" problem at the time she was hired. Scott worked for C.R. England from December 2009 to March 1, 2010; she ended her employment there because she was told Drivers Management had "better quality of services" and she might be able "to do better" there.

Another "DOT exam" was required for Scott to obtain employment with Drivers Management. That examination, dated March 12, 2010, showed that Scott answered "no" to all questions regarding health history issues. She testified that those were truthful responses. On March 20, she sustained her injury, and she left her employment with Drivers Management; her last day was March 26.

As to her March 20, 2010, injury, Scott testified that she and her supervisor were in their truck when it became Scott's turn to drive. In preparation, she climbed up onto her bunk in the truck cab to retrieve her glasses and notebook. Scott stated she "was getting off the top bunk bed in the cab of the truck" and "there is a stair down" and she "went to get all the way down to the landing, which is really maybe [one] foot from the floor level" and in doing that, she "just missed and just landed hard on [her] feet." Scott responded affirmatively when asked if she was fine until she missed a step and landed on her feet, at which time she felt "pain in [her] knee and in [her] back, in [her] leg, in [her] hip." She clarified it was her right leg and both hips, but "the right side hurt more than the left side." This version of the incident suggests the injury occurred upon Scott's feet impacting with the floor when she missed a step.

Scott was challenged on that version of how the injury occurred, with opposing counsel reminding her of the proceedings related to her work injury which she had initially filed in Georgia. During Scott's deposition in the Georgia case on March 18, 2011, Scott testified that while still hanging on the top bunk bed, her knee popped, and then when coming down, she missed the step. She had replied "yes" in her deposition when asked if something actually happened to her knee prior to her hitting the floor of the truck. In this version, Scott's knee injury actually occurred before her feet impacted with the floor.

Scott testified that she told her driving partner that she was hurting from her fall, but since he could not drive, Scott "continued driving until the next day"; they stopped at the Lithia Springs terminal in Georgia on March 21, 2010. Arrangements were made for Scott to see a doctor on March 22 at Concentra Medical Center (Concentra) in Atlanta, Georgia. According to the record from Dr. Shaun Brownlee at Concentra, Scott reported: "I was climbing down the top bunk bed and [I] missed a step and [I] injured my right knee." There is no reference to any back pain or other

pain. Dr. Brownlee diagnosed her with a "knee strain" and a "knee lateral collateral ligament strain." When shown a copy of that medical record, Scott was asked if it referenced any other body part, and Scott replied that the "record says one thing, and they did not put on what was happening to me, so the record is not right." Scott was then shown a document in which Dr. Brownlee responded to a series of questions. Dr. Brownlee stated that Scott did not complain of, nor was treated for, low back pain, right hip pain, "SI joint pain," or foot pain. Scott testified that Dr. Brownlee was inaccurate or not being truthful as to all of those responses.

Scott returned to Concentra on March 25, 2010. The medical record indicated that Scott began modified duty at the Atlanta terminal the day prior, during which Scott spent most of her time sitting. The record further noted that afterwards, Scott noticed an onset of pain in her right leg, hip, back of thigh, ankle, and swelling in her foot, and that these symptoms were not present until she began modified duty. Scott testified that this report was also not accurate.

Scott paid a final visit to Concentra on March 26, 2010, and complained that she was still sore (particularly in her lower back) after her previous physical therapy evaluation. Scott did not return to Concentra after the March 26 appointment; she notified someone at the Lithia Springs office that she was leaving the treatment she was receiving at Concentra because she was "not getting proper treatment because they're not looking at my body parts." Scott's last day of employment with Drivers Management was March 26. Scott did not return to her primary residence in Tennessee because she would have had "to use [her] own money to get treated because Tennessee didn't have any system where [she] could be helped with workers['] compensation, so [she] had to go where [she] could be treated." She went to New York and stayed with her sister because Scott "know[s] the New York system."

On April 2, 2010, in New York, Scott had an MRI of her lumbar spine which showed normal vertebral alignment and vertebral body heights; the impression was an unremarkable examination of the lumbar spine. An MRI of her right knee showed mild patellofemoral osteoarthritis. On April 14, Dr. Gabriel Zatlin suggested physical therapy and sent Scott to see Dr. Eugene Bulkin at Beth Israel Medical Center's Spine Institute.

Dr. Bulkin ordered an additional MRI and, on June 10, 2010, opined that the MRI revealed degenerative disk disease at the L4-5, L5-S1 level without foraminal spinal stenosis. Dr. Bulkin prescribed physical therapy and ordered an EMG. During a June 18 follow-up, Dr. Bulkin concluded that the EMG revealed no signs of active lumbar radiculopathy or peripheral neuropathy or myopathy. Dr. Bulkin referred Scott to an orthopedic surgeon, Dr. Ken Miyasaka, and prescribed continued physical therapy.

On June 29, 2010, Scott saw Dr. Miyasaka, who performed a physical exam and ordered an MRI. After reviewing the MRI, Dr. Miyasaka diagnosed Scott with a partial MCL tear/strain with preexisting patellofemoral osteoarthritis, sciatica of the right lower leg. Dr. Miyasaka wanted Scott to go to physical therapy, but Scott testified that physical therapy would not help her. Dr. Miyasaka's August 31 medical record (exhibit 9) was withdrawn from evidence by Scott.

Dr. Bulkin also examined Scott on June 29, 2010, and discussed the MRI of her spine. Like before, he opined that the MRI revealed mild degenerative disk disease at the L4-5, L5-S1 level. However, he added that Scott had disk herniation and foraminal stenosis. He suggested that she seek a surgical consultation from an orthopedic surgeon for a knee and hip evaluation. Scott

returned to Dr. Bulkin on August 17 for a follow-up concerning her lower back pain. Dr. Bulkin noted that a previous MRI showed small disk bulges in her lumbar spine. Dr. Bulkin opined that she had lumbosacral radiculopathy and spondylosis. He ordered an epidural steroid injection and continued physical therapy. Scott was given steroid injections, but according to Scott, "every time he did the injection, I was in bed for maybe a month or so[.]"

On August 20, 2010, Scott saw Dr. Steven Levine (because "Dr. Zatlin was on vacation"). He diagnosed her with lumbago and placed restrictions on her physical activities. He also said that she could return to work on August 23, with certain restrictions.

On August 28, 2010, Scott fell and injured her left arm while walking outside. At trial, she testified that she had gone outside for some fresh air and that her knee gave out, causing her to fall. An emergency room examination on September 2 revealed no fracture of the wrists. However, she went to Dr. Miyasaka for an elbow examination that same day, and he diagnosed Scott with a radial head fracture in her left elbow.

Scott saw her family practice doctor, Dr. Zatlin, on October 13, 2010, and he sent her to see a specialist "at Bellevue." A report from the Neurology Department of Bellevue Hospital in New York City dated October 14, shows Scott complaining of "RLE pain" and pain radiating to her right leg, and that the pain had worsened after a second fall in August 2010. The attending physician, Dr. Robert Pfeffer, noted that Scott's "strength is difficult to evaluate because of poor effort/pain. . . . Findings suggest lumbar plexus lesion, but difficult to localize [and] one could try to identify [second]ary gain."

On October 28, 2010, Dr. Eugenius Harvey of Industrial Medicine Associates in New York City performed a "consultative" physical medical examination on Scott upon a referral from the "Division of Disability Determination." The record does not reveal who requested the examination, however, the timing appears to correlate with Scott's testimony that "[t]he Social Security doctor placed [her] on disability since 2010." At the time of the exam, Scott's chief complaint was of right-sided lower back pain and right knee pain. Dr. Harvey acknowledged Scott's past treatments, making note of the degenerative disk disease and mild disk protrusion at the L4-5 and L5-S1 levels. Dr. Harvey noted that Scott's thoracic and lumbar spines were normal, except for "right-sided lumbosacral paraspinal tenderness and some right-sided SI joint tenderness. There was no muscle spasm. No scoliosis or kyphosis. SLR was positive on the right at 45 degrees with pain radiating around to the right groin and medially down the leg to the foot." He also noted that she was able to "perform full flexion and extension of her thoracic and lumbar spine." Similar to Dr. Bulkin, Dr. Harvey diagnosed Scott with lumbosacral radiculopathy and spondylosis and right knee medial collateral ligament partial tear and patellofemoral osteoarthritis.

In December 2010, Scott sought treatment from Dr. T.R. Swaminathan of Sayre Neurology. Dr. Swaminathan examined Scott and diagnosed her with right lumbar radiculopathy. He noted that the exam showed "sensory deficit over right L4 and global weakness of all muscle groups in RLE which is likely effort related. SLR positive right side. Lumbar spine MRI done in 6/10 reported as minimal central dis[k] bulge at L4-5 and L5-S1 without spinal or neural foraminal stenosis." This diagnosis was generally similar to the diagnoses of Drs. Bulkin and Harvey, except for the difference related to spinal or neural foraminal stenosis.

Dr. Dermot Reynolds performed arthroscopic surgery on Scott's right knee on March 23, 2011. During a follow-up appointment on April 19, Scott complained that she had had pain and weakness since the surgery, but there are no records of serious complications. On May 11, Scott returned to Dr. Reynolds' office, complaining of back pain. Dr. Reynolds recommended that Scott continue physical therapy.

On November 7, 2011, Dr. William Kennedy performed an independent medical evaluation on Scott. According to Scott's testimony, her former attorney sent her to see Dr. Kennedy. However, the results and conclusions of this exam are not in the record. Scott testified, however, that Dr. Kennedy gave her a 3-percent whole body impairment rating because he knew she "had some defects in [her] lumbar spine [and] his report is very consistent with what Dr. Bulkin said and any other doctor after that."

On January 11, 2012, Scott sought treatment for foot pain from Ryan Chatelain, "D.P.M." Dr. Chatelain opined that Scott might have radiculopathy and recommended that she see a back specialist or neurologist. He also noted that she "admit[ted] to lower back degenerative disk disease. She admit[ted] to osteoarthritis . . . . She deni[ed] rheumatoid arthritis or gout." Dr. Chatelain ordered an "EPG" on February 2. After the "EPG," he opined that "there is no electrophysiological evidence of a large-fiber peripheral neuropathy, active lumbosacral radiculopathy, or a sciatic neuropathy on today's study."

Scott next sought treatment on January 12, 2012, from Dr. Benjamin Knox of Appalachian Orthopedic Associates in Tennessee. According to the medical records, Dr. Knox performed a physical examination based on Scott's complaint of continued lower back pain from the March 2010 fall. Dr. Knox noted that Scott reported that previous MRIs showed disk desiccation at L4-5. However, Dr. Knox concluded, "I advised the patient that I find nothing serious on her evaluation and while she could be referred for pain management[,] I doubt they would have anything to offer her other than repeat epidurals which have already been shown not to work for her." He ultimately advised Scott "to try and live with it and remain as active as possible. Follow up as needed." The record does not reveal any follow-up treatment with Dr. Knox. According to Scott's testimony, she did not "think he did a good job for [her] at all" because "[h]e didn't pay attention" to any of her MRI evaluations and he did not pay attention to her because she did not have insurance to pay him.

In July 2012, Scott received another MRI of her lumbar spine, but the record does not reveal who ordered the procedure. Dr. Douglas Philips interpreted the MRI and opined that Scott had "mild degenerative disk disease at L4-L5 and L5-S1, with left eccentric L5-S1 annular fissure or tear. No spinal canal or neuroforaminal stenosis."

In November 2012, Scott sought treatment with Dr. David Hyams for lower back pain. After examination, Dr. Hyams noted there was "[m]inimal dis[k] disease on MRI and normal electrodiagnostics [sic]. No clear organic reasons for right lower extremity symptoms." He also suggested that Scott continue physical therapy. Scott returned to Dr. Hyams on January 11, 2013. Dr. Hyams noted that Scott failed to produce MRIs showing a mild degenerative disk disease. He noted that she received epidural injections for pain management and that they had been unsuccessful. He recommended a comprehensive pain management program.

In September 2013, Scott was examined at the Weill Cornell Medical Center; another MRI was done. Dr. Roger Bartolotta compared this MRI with one from July 26, 2012, and noted that "[v]ertebral body alignment and stature is maintained with no evidence of spondylolisthesis or spondylolysis. No abnormal motion with flexion of extension. No acute fracture is identified." He also found "[m]inimal L5-S1 dis[k] space narrowing. Dis[k] space heights are otherwise preserved." Scott had another MRI at Weill Cornell on October 23.

Between October 2013 and trial in December 2015, Scott continued to seek treatment for her lower back pain with various medical providers. She was seen at New York Presbyterian Hospital in May 2014, by Dr. Chris Moros at Bronx Island Musculoskeletal Care in July, and by Dr. Robert Marini at Jersey Rehab and Pain Management on July 31. None of these visits provided new diagnoses or information.

Dr. Michael O'Neil of OrthoWest (main office located in Omaha, Nebraska), has been a practicing orthopaedic surgeon for over 40 years. Dr. O'Neil conducted a review of Scott's medical records through January 2012. In his April 10, 2014, report, Dr. O'Neil summarized Scott's medical history for her knee and back complaints. As for Scott's knee, Dr. O'Neil relied upon Dr. Reynolds' records which showed findings of a radial articular tear resulting in a partial medial meniscectomy. As a result, Dr. O'Neil opined that Scott was entitled to a 2-percent permanent impairment of the extremity in accordance with the "AMA Guides." As to Scott's chronic complaints about her low back, Dr. O'Neil concluded that Scott reached MMI when she was examined by Dr. Knox on January 10, 2012, and was not entitled to any permanent physical impairment or physical restrictions as a result of "her alleged back injury on March 20, 2010." Dr. O'Neil further opined that "no additional diagnostic or therapeutic treatment is indicated for her complaints of back pain and right lower extremity pain."

Finally, on April 27, 2015, Dr. Sana Bloch of Medalliance Medical Health Services in New York City examined Scott and wrote a letter to Dr. Marini of Jersey Rehab and Pain Management, describing the treatments Scott received. Dr. Bloch described MRI evidence of disk bulges at T5-T6 and T6-T7 and a minor bulge at C3-C4 and C4-C5. Dr. Bloch stated that her review of the MRI and Scott's spine "could not explain the patient's symptomatology except for pain." She further hypothesized that, because Scott had been constantly symptomatic for 5 years, it was likely Scott's symptoms were permanent.

With regard to employment since leaving Drivers Management in March 2010, Scott testified that she worked for a week as a public health advisor at Harlem Hospital in July 2010, and was applying for various jobs at the end of August 2010. Scott had obtained a bachelor's degree in health science from State University of New York in 1997, and in 2001, she obtained two master's degrees (business administration and community development) from Southern New Hampshire University.

The compensation court entered an award on March 14, 2016. The court's order chronologically summarized Scott's medical history, beginning with Scott's complaints about her back beginning in 1990, and concluding with Dr. Knox's January 10, 2012, examination and assessment. The court found that on March 20, 2010, Scott slipped and fell on her way down from the top bunk of the truck, and that her knee popped before she landed on her feet. Relying on Dr. O'Neil's report, the compensation court awarded Scott "a loss of use of the right leg of 2 percent

which entitles [Scott] to 4.3 weeks of permanent benefits." As for Scott's complaints about her back, the court noted that Dr. O'Neil opined that Scott reached MMI "from her alleged back injury of March 20, 2010, when she was examined by Dr. Benjamin Knox on January 10, 2012[,] and he informed her that he had nothing to offer her in the way of treatment." The compensation court also concluded, based upon Dr. O'Neil's report, that Scott had "no permanent impairment or permanent restrictions and that no additional diagnostic or therapeutic treatment is indicated for her complaints of back pain and right lower extremity pain." As for temporary benefits, the court noted that there was no evidence of an actual date of MMI for Scott's knee injury, but that Dr. O'Neil did find MMI was reached for the low back injury as of January 10, 2012. Accordingly, the compensation court awarded temporary benefits from March 25, 2010, through January 10, 2012. The court also ordered Drivers Management to pay certain medical bills (knee treatments through date of release by Dr. Reynolds; low back treatment from date of injury through January 10, 2012), with credit given for payments already made by Drivers Management. The court did not award future medical care, and denied any claim for vocational rehabilitation. Scott appeals from this award.

## ASSIGNMENTS OF ERROR

Scott's brief does not contain an assignments of error section.

## STANDARD OF REVIEW

Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2014) requires a separate, concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error. Where the brief of a party fails to comply with the mandate of § 2-109(D)(1)(e), we may proceed as though the party failed to file a brief or, alternatively, may examine the proceedings for plain error. *In re Interest of Samantha L. & Jasmine L.*, 286 Neb. 778, 839 N.W.2d 265 (2013). Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014).

A litigant proceeding on a pro se basis is obligated to follow the same appellate rules and procedures applicable to counsel. *Mix v. City of Lincoln*, 244 Neb. 561, 508 N.W.2d 549 (1993). Scott failed to comply with § 2-109(D)(1)(e); she did not include a separate assignments of errors section setting forth each error she contends was made by the compensation court. Therefore, we examine the proceedings for plain error.

## ANALYSIS

Scott argues that the compensation court incorrectly concluded that she reached MMI for the injury to her "lumbar spine" since "she continues to undergo surgeries and medical care[.]" Brief for appellant at 10. She asserts that a variety of medical records in evidence support her claim. Scott does not allege any error by the compensation court with regard to the permanent impairment rating for her right knee or other aspects of the court's decision, so we limit our review to the compensation court's determination that she was at MMI as of January 10, 2012, with regard to all of her injuries arising from the March 20, 2010, accident.

The date of maximum medical improvement for purposes of ending a workers' compensation claimant's temporary disability is the date upon which the claimant has attained maximum medical recovery from all of the injuries sustained in a particular compensable accident. *Stacy v. Great Lakes Agri Mktg.*, 276 Neb. 236, 753 N.W.2d 785 (2008). A claimant has not reached maximum medical improvement until all the injuries resulting from an accident have reached maximum medical healing. *Id*. And generally, whether a workers' compensation claimant has reached maximum medical improvement is a question of fact. *Id*.

Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Caradori v. Frontier Airlines, Inc.*, 213 Neb. 513, 329 N.W.2d 865 (1983). As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Hynes v. Good Samaritan Hosp.*, 291 Neb. 757, 869 N.W.2d 78 (2015).

In testing the sufficiency of the evidence to support the findings of fact by the Workers' Compensation Court, the evidence must be considered in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Pearson v. Archer-Daniels-Midland Milling Co.*, 285 Neb. 568, 828 N.W.2d 154 (2013).

Further, if the record in a workers' compensation case presents conflicting medical reports and testimony, an appellate court will not substitute its judgment for that of the compensation court regarding which medical evidence to rely upon. See *Kerkman v. Weidner Williams Roofing Co.*, 250 Neb. 70, 547 N.W.2d 152 (1996). The compensation court is entitled to accept the opinion of one medical expert over that of another, and as the sole trier of fact, the compensation court is the sole judge of the credibility of the medical evidence and the weight to be given to it. See *id*. Also, the Workers' Compensation Court is not bound by the opinions of medical experts, regardless of whether they are contradicted or not. *Cummings v. Omaha Public Schools*, 6 Neb. App. 478, 574 N.W.2d 533 (1998).

The compensation court's order chronologically summarizes Scott's medical history, and points out that Scott's "story begins on January 31, 1990," and that she has "a long history regarding her back." Although the compensation court referenced a 3-percent whole person permanent impairment determined by Dr. William Kennedy in an independent medical examination performed on November 7, 2011, the court explained that there were no records for that examination presented to the court. Further, the court obviously found other evidence in the record, particularly the opinion of Dr. O'Neil, to be more persuasive regarding MMI and any permanent impact caused by the March 20, 2010, accident on Scott's preexisting chronic back pain.

Dr. O'Neil opined that Scott had reached MMI as of January 10, 2012, when Dr. Knox informed Scott that he had nothing to offer her in the way of treatment for her lower back pain. Dr. Knox advised Scott that he found "nothing serious on her evaluation." However, according to Scott's testimony, she did not think Dr. Knox "did a good job for [her] at all" because "[h]e didn't pay attention" to any of her MRI evaluations and he did not pay attention to her because she did not have insurance to pay him. However, a medical professional and the compensation court viewed Dr. Knox's evaluation differently. In this case, Dr. O'Neil relied upon Dr. Knox's

examination and assessment to determine MMI, and also concluded that Scott had no permanent impairment or permanent restrictions. Further, Dr. O'Neil opined that no additional diagnostic or therapeutic treatment was indicated for Scott's complaints of back pain and right lower extremity pain. Dr. O'Neil stated:

> [T]here is ample documentation in the medical records that [Scott] has had a long history of low back pain with radicular symptoms dating back to 1990. She has been seen by numerous physicians with no <u>objective</u> abnormal physical findings at any time. She has had at least three MRI studies of the lumbar spine showing no significant disk herniation at any level. She does have very mild degenerative disk disease at L4-L5 and L5-S1 without central or foraminal stenosis, *which are normal findings for her age* [emphasis added]. She has not responded to all conservative treatment including chiropractic treatments, physical therapy, epidural blocks and steroid injections of the SI joint.

Although the compensation court agreed with Dr. O'Neil that there was no permanent impact on Scott's low back as a result of the March 20, 2010, accident, the court nevertheless ordered Drivers Management to pay for Scott's medical treatment for her low back complaints until the point of MMI in January 2012. However, allowing for the temporary treatment of Scott's low back pain is not inconsistent with a finding of zero permanent impairment, especially in this case where there is considerable evidence of longstanding preexisting complaints of low back pain and, according to Dr. O'Neil, "no <u>objective</u> abnormal physical findings at any time." We find no error in the compensation court's reliance on Dr. O'Neil's opinions and the underlying medical records supporting his conclusions.

Scott argues in her brief that exhibits 17, 29, 31, 34, 35, 47, and 50 show that her lumbar spine was not at MMI on January 10, 2012. Exhibits, 17, 31, 34, and 35, are all records from treatments Scott received before her visit to Dr. Knox on January 10, 2012, the date relied upon by Dr. O'Neil, and thus, the compensation court, to place Scott at MMI. Since we have already discussed the evidence properly relied upon by the compensation court to determine MMI as of that date, we need not consider other treatments preceding that MMI date since this court will not substitute its judgment for that of the compensation court regarding which medical evidence to rely upon in reaching its decision. As for the remaining medical records for treatments after January 10 (exhibits 29, 47, 50) which Scott claims supports her position of not being at MMI for her back injury, we note that none of these exhibits provides any causal connection between her ongoing symptoms and the March 2010 accident.

Scott also appears to be arguing that the compensation court erred because its decision did not specifically reference four exhibits; we set forth in parentheses a brief summary of Scott's arguments as to each exhibit: exhibit 39 (Dr. Kennedy, January 3, 2013, opines 3-percent whole person permanent impairment rating), exhibit 58 (Dr. Marini, December 22, 2014, says Scott is unable to work), exhibit 60 (Dr. Bloch, April 27, 2015, states Scott's symptomology is permanent), and exhibit 64 (December 28, 2011, loss of earning capacity report notes mild degenerative disk disease at L4-5, L5-S1 with disk herniation and foraminal stenosis). We find no error by the compensation court in not specifically referring to these particular portions of these exhibits in reaching its final decision. As previously noted, the compensation court is entitled to accept the

opinion of one medical expert over that of another, and as the sole trier of fact, the compensation court is the sole judge of the credibility of the medical evidence and the weight to be given to it. See *Kerkman v. Weidner Williams Roofing Co., supra*.

The compensation court provided considerable detail in its decision regarding Scott's preexisting medical history and her treatment arising from the March 20, 2010, accident. The court was entitled to accept Dr. O'Neil's opinion that Scott reached MMI on January 10, 2012, and that Scott had no permanent restrictions or impairment for her complaints of back pain arising from the March 20, 2010, accident. An appellate court will not substitute its judgment for that of the compensation court regarding which medical evidence to rely upon. See *Kerkman v. Weidner Williams Roofing Co., supra*.

CONCLUSION

We find no plain error in the record and affirm the compensation court's award filed March 14, 2016.

AFFIRMED.